8 A.3d 745

**In re ADOPTION/Guardianship OF TA'NIYA C.**

**No. 133, Sept. Term, 2009.**

Court of Appeals of Maryland.

Nov. 22, 2010.

Joan Little, Chief Attorney (Kelly E. James, Legal Aid Bureau, Inc., Baltimore, MD), on brief, for petitioner.

Brian L. Zavin, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for respondent.

Argued before HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

ADKINS, J.

We return again to the problematic question of how a court should resolve a case in which the rights of an individual to raise her child without state interference may ultimately con-

flict with the best interests of that child. A juvenile court is authorized by statute to terminate the legal relationship between a parent and child upon certain conditions, and after certain findings are made. Maryland Code, (1984, 2006 Repl. Vol., 2009 Supp.), § 5–323 of the Family Law Article ("FL"). Although the paramount consideration identified in the statute, as set forth in subsection (b), is the "best interests of the child," constitutional and common-law rights of parents require consideration of countervailing factors that can make the "best interest" analysis somewhat circuitous.

Judge Wilner, writing for this Court in *In re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 937 A.2d 177 (2007), undertook a comprehensive review of Termination of Parental Rights ("TPR") cases, as well as those involving claims by third parties to custody of children in an effort to reconcile some seeming inconsistencies in our decisions. *Id.* at 494, 937 A.2d at 189. He concluded that "our case law has been clear and consistent, that, even in contested adoption and TPR cases ... the best interest of the child remains the ultimate governing standard." *Id.* at 496, 937 A.2d at 189. This opinion is invaluable for achieving an understanding of the law in this area.

Yet, it is undeniable that in our prior decisions we have struggled in defining how parental unfitness, exceptional circumstances and the child's best interest analyses relate to one another. *Compare Shurupoff v. Vockroth,* 372 Md. 639, 662, 814 A.2d 543, 557 (2003) (stating that the child's best interest is the "ultimate, determinative factor" in custody disputes) *with McDermott v. Dougherty,* 385 Md. 320, 418, 869 A.2d 751, 808 (2005) (stating that "the constitutional right [of the parent] is the ultimate determinative factor."). To ensure that juvenile courts have clear and consistent guidance as they decide whether termination of parental rights is justified in a given case, we reexamine the law in this area and confirm once again that the child's best interest is the prevailing standard in these determinations.

## FACTS AND LEGAL PROCEEDINGS

At the heart of this TPR case is a seven-year-old girl, Ta'Niya.[1] In October 2004, when Ta'Niya was eighteen months old, she and her older sister, Jamiara, came to the attention of the Baltimore City Department of Social Services ("DSS") when it received reports that the house where the children were living was dirty, and that Ta'Niya had ringworm. By the time DSS intervened, Jamiara had gone to live with a maternal relative. Four years later, a court ordered that Jamiara be returned to the care of Ms. L., the girls' biological mother, subject to an Order of Protective Supervision. Ta'Niya, however, was adjudicated a Child in Need of Assistance ("CINA")[2] because Ms. L. did not have stable and appropriate housing, Ta'Niya was diagnosed with high levels of lead and was behind in her immunizations, and Ta'Niya's father was not in a position to care for her, he himself needing housing and mental health assistance. As no other relatives were willing to care for Ta'Niya, DSS placed her in foster care.

From October 2004 to January 2009, Ta'Niya was placed in three different homes. When she was first placed in foster care, she experienced behavioral problems, including pulling her hair out, extensive crying, and hitting. These behaviors gradually subsided and later disappeared after Ta'Niya went to live in the foster home of Alicia and Luther W. At the time of the TPR hearing, Ta'Niya appeared to be a "very happy" child, who was doing well in school, loved to read, and had "an incredible relationship" with her foster parents, whom she

---

1. Ta'Niya is the Petitioner in this case, and her mother, Ms. L., is the Respondent. At the time of the Termination of Parental Rights ("TPR") hearing, Ta'Niya was five years old.

2. A "Child in Need of Assistance" is a child who requires court intervention because he or she has been abused, neglected, has a developmental disability and/or a mental disorder, and his or her parents, guardian, or custodian, are either unwilling or unable to provide proper care and attention to the child and the child's needs. Md.Code (1974, 2006 Repl.Vol.), § 3–801(f) of the Courts & Judicial Proceedings ("CJP") Article.

called "mommy" and "daddy." Mr. and Mrs. W. continued to be Ta'Niya's foster parents at the time of the TPR hearing and expressed a wish to adopt her.

During the four years that Ta'Niya was in the foster care system, Ms. L. had limited contact with her. From October 2004 to January 2007, Ms. L. requested only two visits with Ta'Niya. Ms. L. testified that she frequently visited Ta'Niya from September 2005 to November 2006, when Ta'Niya lived with a relative, but did not notify DSS of those visits. From November 2006 through January 2008, Ms. L. visited Ta'Niya three times. In fact, Ms. L. did not begin to visit Ta'Niya on a regular basis until after DSS filed its TPR petition in January 2008.

Ms. L.'s reunification attempts with Ta'Niya through DSS have also been scarce. Over the time period from October 2004 to January 2008, Ms. L. signed four family service agreements, the terms of which were substantially the same: Ms. L. was to complete parenting classes, obtain stable housing, maintain employment, and submit to a substance abuse test. To assist Ms. L. in fulfilling these requirements, DSS's case workers provided Ms. L. with referrals for housing, job readiness programs, and employment.[3] Yet despite these efforts, Ms. L. showed no progress with regard to the terms of the service agreements, other than completing parenting classes by December 2004.[4]

In January 2007, Ms. L. informed DSS that she had been approved to receive food stamps and disability insurance. She also moved in with her mother at that time, and in September 2007, they began renting a house together. One month later,

---

3. When Ta'Niya was first placed in foster care, DSS also tried to convince Ms. L. to move to a shelter, to precipitate her reunification with Ta'Niya. Ms. L. refused, alleging that she had to care for her sick grandmother.

4. From April 2005 to August 2006, Ms. L. had no contact with DSS at all. From October 2005 to April 2006, and from July to August 2006, Ms. L. was incarcerated for violations of probation on possession of controlled substances convictions but did not inform DSS of her whereabouts.

Ms. L. started working for a cleaning company but was laid off in September 2008. After that, Ms. L. worked for a temp agency and made additional money on the side cutting hair.

As time progressed without a showing that Ms. L. was ready for reunification with Ta'Niya,[5] DSS filed a Petition for Guardianship of Ta'Niya, seeking termination of Ms. L.'s parental rights. In May 2008, Ms. L. completed a second 10–week parenting class and, in August 2008, she completed a drug screen and did not appear to need treatment or counseling. The week before trial, Ms. L. was rehired by the cleaning company for which she had worked in 2007, but her living arrangements were again uncertain.

The TPR hearing lasted three days, and at the conclusion of the hearing, the juvenile court denied DSS's petition, ruling that DSS failed to demonstrate, by clear and convincing evidence, that Ms. L. was unfit or that there were exceptional circumstances that would justify termination of Ms. L.'s parental rights. In reaching its conclusion, the court "very quickly" examined the statutory considerations enumerated in FL Section 5–323.[6]

The court began its oral opinion by stating that *Rashawn* "changed the law" by "chang[ing] it now from how it looks to

---

**5.** Ms. L. did not contact DSS from April 2007 to December 2007. In fact, Ms. L. did not request reunification with Ta'Niya until after DSS filed the TPR Petition.

**6.** Effective October 1, 2009, the General Assembly rewrote FL Section 5–323(b) to read:

(b) Authority.—If, after consideration of factors as required in this section, a juvenile court finds by clear and convincing evidence that *a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating* the rights of the parent is in a child's best interests, the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

(1984, 2006 Repl.Vol., 2009 Supp.) (emphasis added indicating additional language). Because Ta'Niya's TPR hearing occurred prior to this addition, we shall refer to FL Section 5–323 (1984, 2006 Repl.Vol., 2008 Supp.), the version of the statute in effect at the time.

the child to what should happen regarding the parents." In finding that no exceptional circumstances existed, the court seemed to focus solely on Ms. L.'s actions and inactions. Namely, the court acknowledged that "it wasn't a great performance by the mother, [but] she did much of what she was asked for. Not timely, not well-documented, but what she didn't do I don't think rises to the level of extraordinary circumstances that would justify termination." Later, the court reiterated that "failure for lack of timely performance [does] not amount to exceptional circumstances[.]" Yet, at the same time, the court commented that Ms. L. is not "a person who can take care of a child[,]" and that she may never "be ready" to have Ta'Niya back.

The court was also puzzled by DSS's insistence on termination of parental rights when Ta'Niya's half-sibling, Jamiara, had already been returned to Ms. L.'s care. The court reasoned that if, in Jamiara's case, Ms. L. was fit and there were no exceptional circumstances that would have prevented her from reuniting with Jamiara, "then [it] is the same with respect to Ja'Mira [sic] as it is with respect to Ta'Niya[.]" At the end of its oral opinion, the juvenile court acknowledged that leaving her foster parents would be detrimental to Ta'Niya's well-being but maintained that *"Rashawn H.* would almost ask us to ignore that."

Ta'Niya filed an appeal to the Court of Special Appeals ("CSA"),[7] arguing that the juvenile court erred as a matter of law when deciding not to terminate Ms. L.'s parental rights by mistakenly believing that *Rashawn* "changed the standard in termination of parental rights cases from best interest of the child to best interest of the parent," and "precluded it from viewing the totality of circumstances of the case because Mother had custody of [Ta'Niya's] half-sibling under an order of protective supervision." Ta'Niya also argued that the juvenile court "abused its discretion in denying the termination of parental rights when the trial court found that [Ta'Niya]

---

7. DSS did not appeal the juvenile court's decision.

should not be returned to Mother, that there were no services that would assist Mother in having [Ta'Niya] returned, and that Mother might never be ready to have [Ta'Niya] returned to her."

In an unreported opinion, the CSA affirmed the juvenile court's decision. *In re Adoption/Guardianship of Ta'Niya C.,* No. 2863, slip. op. at 7–13 (August 28, 2009). The CSA held that "notwithstanding [the juvenile court judge's] colorful description of the holding in *Rashawn,* he remained focused on the appropriate legal standard and considered the relevant statutory factors." *Id.* at 13. The court also held that the juvenile court did not abuse its discretion as "a fair reading of the court's ruling discloses that the circuit court judge's puzzlement that [DSS] had returned appellant's sibling to her mother was not a decisive factor in his analysis[,]" and the court's finding that Ms. L. was presently unfit to be Ta'Niya's permanent custodian was not inconsistent with its finding that Ms. L. was not "so unfit as to lose parental rights." *Id.* at 14.

Ta'Niya filed a petition for certiorari, and we granted review to consider the following issues:

1) Whether it is desirable or in the public interest to interpret *Rashawn H.* as requiring a court to use a parental interest standard when making a decision to terminate parental rights, thereby, denying permanency to Ta'Niya C.
2) Whether it is desirable or in the public interest to interpret the "exceptional circumstances" provision in *Rashawn H.* in a manner that denies permanency to a child who has been out of her mother's care for over four years.
3) Whether the lower court's denial of the Petition to terminate parental rights demonstrated an application of federal and state permanency planning statutes that was desirable and in the public interest when that application failed to provide permanency for Ta'Niya C.

*In re Adoption/Guardianship of Ta'Niya C.,* 411 Md. 598, 984 A.2d 243 (2009). For reasons we explain below, we hold that the trial court erred in interpreting *Rashawn* and reverse on the first issue. We do not reach the remaining two issues,

because their resolution depended on the court's misunderstanding of *Rashawn.* We remand for consideration of these issues under the correct standard.

## DISCUSSION

### Standard Of Review

In reviewing a juvenile court's decision with regard to termination of parental rights, we utilize three different but interrelated standards. *See In re Adoption/Guardianship of Victor A.,* 386 Md. 288, 297, 872 A.2d 662, 667 (2005). Namely,

[w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c) ] applies. [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* (quoting *In re Yve S.,* 373 Md. 551, 586, 819 A.2d 1030, 1051 (2003)) (citations omitted).

### TPR Statute

FL Section 5–323 is the Maryland statute governing termination of parental rights. In Subsection (b) thereof, a juvenile court is granted the right, not present under common law, to terminate parental rights and grant guardianship of the child:

(b) Authority.—If, after consideration of factors as required in this section, a juvenile court finds by clear and convincing evidence that a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests, the juvenile court may grant guardianship of the

child without consent otherwise required under this subtitle and over the child's objection.

The balance of FL Section 5–323 sets forth certain factors to be considered and procedures that must be followed.[8]

---

8.  FL Section 5–323 provides in pertinent part:
    (d) Considerations.—Except as provided in subsection (c) of this section, in ruling on a petition for guardianship of a child, a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including:
    (1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
    (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent;  and
    (iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;
    (2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:
    (i) the extent to which the parent has maintained regular contact with:
    1.  the child;
    2.  the local department to which the child is committed;  and
    3.  if feasible, the child's caregiver;
    (ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;  [and]
    \*       \*       \*
    (iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;
    (3) whether:
    (i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;
    \*       \*       \*
    (iii) the parent subjected the child to
    1.  chronic abuse;  [or]
    2.  chronic and life-threatening neglect;
    (v) the parent has involuntarily lost parental rights to a sibling of the child;  and
    (4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;
    (ii) the child's adjustment to:

■ Petitioner Ta'Niya C. argues that the juvenile court erred when it interpreted *Rashawn H.* as changing the law governing TPR cases to a standard favoring parental interest over the child's best interest, and consequently refused to terminate the parental rights of Ms. L, Ta'Niya's mother. Ms. L, Respondent, contends that "the record, when viewed as a whole, demonstrates that the trial court applied the correct legal standard[.]" At the time of the hearing, subsection (b) of that statute provided that in order for a juvenile court to grant DSS guardianship of a child without a parent's consent, the court must find, by clear and convincing evidence, that "terminating the rights of a parent is in the child's best interests[.]" As the statute requires and as we have recently expounded in *Rashawn*, in making those determinations, a juvenile court must consider and make specific findings with respect to the relevant statutory factors under FL Section 5–323(d), and, "mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness . . . or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child[.]" *Rashawn*, 402 Md. at 501, 937 A.2d at 192.

At the time we decided *Rashawn*, the TPR statute [9] did not expressly require that a juvenile court find parental unfitness or exceptional circumstances that would make continuation of a legal relationship with the parent detrimental to the child's

---

1. community;
2. home;
3. placement; and
4. school;

(iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being. . . .

9. At the time the mother's rights were terminated in *Rashawn*, the statutory standards governing termination of parental rights were set forth not in FL Section 5–323 (1984, 2006 Repl.Vol., 2009 Supp.), but instead in FL Section 5–313 (1984, 2004 Repl.Vol.), which likewise did not specifically mention parental unfitness or exceptional circumstances.

best interest. *See id.* at 489–91, 937 A.2d at 185. Rather, it required only a finding that terminating parental rights was in the child's best interest. *See id.* Thus, in *Rashawn,* a mother, whose parental rights had been terminated, argued that Maryland's TPR statute was unconstitutional because it did not take into consideration the parent's Constitutionally-based right to raise his or her children. *Id.* at 494–95, 937 A.2d at 187–88. In considering the mother's claim, we recognized the presumption that it is in the best interest of children to remain in the custody of their parents. *Id.* at 495, 937 A.2d at 188. We emphasized, however, that the parents' right is not absolute and "must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect." *Id.* at 497, 937 A.2d at 189. Therefore, this parental presumption "may be rebutted upon a showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would make continued custody with the parent detrimental to the best interest of the child." *Id.* at 495, 937 A.2d at 188.

Even though at that time our TPR statute did not call for the finding of either parental unfitness or exceptional circumstances, we nevertheless found that this necessary finding was "implicit from the statutory scheme." *Rashawn,* 402 Md. at 498, 937 A.2d at 190. Accordingly, in order to protect parental rights, we pointed out that in applying the statutory provisions, juvenile courts must keep in mind "three critical elements." *Id.* First, the court must focus on the continued parental relationship and require that "facts . . . demonstrate an unfitness to have a continued parental relationship with the child, or exceptional circumstances that would make a continued parental relationship detrimental to the best interest of the child." *Id.* at 499, 937 A.2d at 190. Second, the State must show parental unfitness or exceptional circumstances by clear and convincing evidence.[10] *Id.* Third, the trial court

---

10. The same considerations apply now that FL Section 5–323 specifically calls for a finding of parental unfitness or exceptional circumstances that would make continuation of a parental relationship detri-

must consider the statutory factors listed in subsection (d) to determine whether exceptional circumstances [11] warranting termination of parental rights exist.[12] *Id.* What has proved to be elusive in this equation is defining "exceptional circumstances," and determining its interaction with the "child's best interests" standard.

## Probing The Meaning Of *Rashawn*

*Rashawn* explicitly reiterated that "the best interest of the child remains the ultimate governing standard" in contested adoption cases, TPR proceedings, and permanency plan proceedings. *Id.* at 496, 937 A.2d at 189. *Rashawn* also made clear that the same factors that a court uses to determine whether termination of parental rights is in the child's best interest under the TPR statute equally serve to determine whether exceptional circumstances exist. *Id.* at 499, 937 A.2d at 190. In its words, "[The statutory] factors, though couched as considerations in determining whether termination is in the child's best interest, serve also as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship." *Id.*

Despite these clear pronouncements that the child's best interest infuses every element of a court's analysis in TPR cases, other language crept into the opinion and apparently caused confusion. Specifically, citing *McDermott v. Dougher-*

mental to the child's best interest. *See* FL Section 5–323(b) (1984, 2006 Repl.Vol., 2009 Supp.).

11. In addition to these statutory factors, courts may consider "such parental characteristics as age, stability, and the capacity and interest of a parent to provide for the emotional, social, moral, material, and educational needs of the child." *Pastore v. Sharp*, 81 Md.App. 314, 320, 567 A.2d 509, 512 (1989), cert. denied, *Pastore v. Sharp*, 319 Md. 304, 572 A.2d 182 (1990).

12. Because the juvenile court in *Rashawn* did not articulate its findings with respect to either parental unfitness or exceptional circumstances, we remanded the case for further proceedings in accordance with the correct standard. *Rashawn*, 402 Md. at 505, 937 A.2d at 194.

*ty,* 385 Md. 320, 869 A.2d 751 (2005), *Rashawn* said that if no parental unfitness or exceptional circumstances exist, "there is no need to inquire further as to where the best interest of the child lies." *Rashawn,* 402 Md. at 495, 937 A.2d at 177.[13] This "other language", which we call the "no further inquiry" language, could be interpreted to mean that parental unfitness, exceptional circumstances and the child's best interests

---

**13.** This quotation appeared as part of the following paragraphs:

The great majority of custody (and visitation) disputes, of course, are between the child's parents, neither of whom, at least since the adoption of our State Equal Rights Amendment (Md. Decl. of Rts., Art. 46), has any preference over the other in that regard. In that setting, the governing standard, here and throughout the country, is and long has been the child's best interest. *See McDermott v. Dougherty,* 385 Md. 320, 353–55, 869 A.2d 751, 770–71 (2005). Custody and visitation decisions in disputes between the parents are made based on what the court finds to be in the child's best interest. That decision generally lies within the sound discretion of the trial judge and is rarely disturbed on appeal. *See Domingues v. Johnson,* 323 Md. 486, 492, n. 2, 593 A.2d 1133, 1136, n. 2 (1991).

A different element, though not a different standard, comes into play when the dispute is between a parent and a third party, for in that setting, there is a legal preference. In those cases, we have recognized that parents have a fundamental, Constitutionally-based right to raise their children free from undue and unwarranted interference on the part of the State, including its courts. See, most recently, *Koshko v. Haining,* 398 Md. 404, 921 A.2d 171 (2007); also *McDermott v. Dougherty, supra,* 385 Md. 320, 869 A.2d 751; *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003); *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977). Even in those cases, however, we have not discarded the best interest of the child standard, but rather have harmonized it with that fundamental right.

We have created that harmony by recognizing a substantive presumption—a presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents. The parental right is not absolute, however. The presumption that protects it may be rebutted upon a showing either that the parent is "unfit" or that "exceptional circumstances" exist which would make continued custody with the parent detrimental to the best interest of the child. In McDermott, the Court made clear that, in a parent-third party custody dispute, the initial focus must be on whether the parent is unfit or such exceptional circumstances exist, for, if one or the other is not shown, the presumption applies and there is no need to inquire further as to where the best interest of the child lies. In Koshko, we extended that approach to parent-third party visitation disputes as well.

*Rashawn,* 402 Md. at 494–495, 937 A.2d at 177 (emphasis added).

are different and separate analyses, and even that the child's best interest inquiry does not come into play until there is a finding of parental unfitness or exceptional circumstances. This may explain here the juvenile judge's belief, albeit mistaken, that *Rashawn* "changed the law" and moved our analysis away from the "best interests of the child" standard. Such a reading, however, is misguided. In explaining the "no further inquiry" language, we trace its origin and examine its context.

Although borrowed from *McDermott,* the "no further inquiry" language actually can be traced to our decision in *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977). *Ross* is a seminal custody case that involved a custody dispute between the natural mother and third parties who cared for the child fulltime for over eight years. *Id.* at 181–82, 372 A.2d at 589–90. Despite the presumption that being in the custody of a natural parent is in the child's best interest, we upheld the award of custody to the third parties because (1) there were exceptional circumstances that would have made giving custody to the natural mother detrimental to the child's best interest, and (2) remaining in the custody of the third parties was in the child's best interest. *Id.* at 192, 372 A.2d at 594. In so holding, we emphasized that the child's best interest is "always determinative in child custody disputes." *Id.* at 178–79, 372 A.2d at 587.

The *Ross* Court also laid out the following factors for deciding whether there are exceptional circumstances that would make parental custody detrimental to the child's best interest:

[T]he length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent.

*Id.* at 191, 372 A.2d at 593. We also observed that "[t]he child may be so long in the custody of the nonparent that, even though there has been no abandonment or persistent neglect by the parent, the psychological trauma of removal is grave enough to be detrimental to the best interest of the child." *Id.* at 191, 372 A.2d at 594–95 (emphasis added).

The "no further inquiry" language cropped up there for the first time. After clear iteration that the child's best interest is "always determinative in child custody disputes," the Court immediately added that "in parent-third party disputes over custody, it is only upon a determination . . . that the parent is unfit or that there are exceptional circumstances . . . that the court need inquire into the best interest of the child in order to make a proper custodial disposition." *Id.* at 178–79, 372 A.2d at 587. The potential for this language to mislead has lingered.

We confronted this potential in *Shurupoff v. Vockroth,* which was a custody dispute case between a natural father and maternal grandparents. 372 Md. 639, 814 A.2d 543 (2003). There we reiterated that "[t]he court must always, necessarily, inquire into what is in the child's best interest, for that is the ultimate, determinative factor." *Id.* at 662, 814 A.2d at 557. We explained that when we said in *Ross* that there was no need to inquire into the child's best interest if the parent was fit and there were no exceptional circumstances, we "simply intended to make clear that, because of the presumption [favoring parental custody], a parent and a third party do not stand on an equal footing, and that, before the third party may be granted custody, he or she must rebut the presumption[.]" *Id.* To clarify even further, we continued,

[s]o long as the best interest of the child remains the definitive standard and there is any reasonable alternative, it defies both logic and common sense to place a child in the custody of anyone, including a parent, when either that person is unfit to have custody or such action, because of exceptional circumstances, would be detrimental to the child's best interest. What Ross teaches is that (1) the best interest standard applies and prevails, and (2) that standard

is gratified by giving custody to the parent when the presumption has not been rebutted and by denying custody to the parent when it has been rebutted.

*Id.*

Two years later, however, in *McDermott,* a custody dispute between a father and maternal grandparents, the "no further inquiry" language was re-introduced, but only for instances when private third parties seek custody against the will of a parent. *McDermott,* 385 Md. at 374, 869 A.2d at 782.[14] The Court stated that it did not intend to alter the child's best interest standard that governs visitation and custody disputes, *id.* at 354, 869 A.2d at 770, but nevertheless held:

[I]n private actions in which private third parties are attempting to gain custody of children of natural parents over the objection of the natural parents, it is necessary first to prove that the parent is unfit or that there are extraordinary circumstances posing serious detriment to the child, before the court may apply a "best interest" standard.

*Id.* at 374–75, 869 A.2d at 783 (emphasis added). Indeed, *McDermott* went as far as to say that in private custody disputes between a parent and a third party, "the constitutional right [of the parent] is the ultimate determinative factor." *Id.* at 418, 869 A.2d at 808. The opinion disavowed *Shuru-*

---

**14.** Judge Wilner, concurring in the judgment only, disagreed with the majority's mischaracterization of the governing standard in custody disputes. *Id.* at 437, 869 A.2d at 819–20 (Wilner, J., concurring). He reiterated our statement in *Ross,* where we emphasized that "the best interest of the child standard is always determinative in child custody disputes." *Id.* (quoting *Ross,* 280 Md. at 178–79, 372 A.2d at 587) (emphasis in the original). Judge Wilner explained that under the child's best interest standard, "[t]he presumption afforded under Ross is rebutted only when the evidence shows that the parent is unfit to have custody or that exceptional circumstances exist which would make parental custody detrimental to the child's best interest." *Id.* at 439–40, 869 A.2d at 821. Moreover, he pointed out, even if one were to view parental unfitness/exceptional circumstances and the child's best interest as separate analyses, a court would still "necessarily" need to "examine and be governed by what is in the child's best interest." *Id.* at 440, 869 A.2d at 821. After all, he urged, both parental unfitness and exceptional circumstances are measured in terms of detriment to the child's best interest. *Id.*

*poff's* clarification of *Ross, id.* at 435 n. 49, 869 A.2d at 819 n. 49, thereby making it sound again as if "exceptional circumstances" and the child's "best interest" were separate and distinct standards, at least in private custody disputes.[15] *McDermott,* 385 Md. at 374, 869 A.2d 751.

This history of shifting standards can be disconcerting, but as Justice Cardozo wrote, "we should know ... that magic words and incantations are as fatal to our science as they are to any other." Benjamin N. Cardozo, The Growth of the Law, Yale University Press 66 (1924).[16]

Two years after *McDermott,* Judge Wilner, writing for the Court in *Rashawn,* undertook the difficult task of synthesizing and harmonizing the Court's decisions on this topic. His opinion carried forward the precept from earlier TPR cases

---

**15.** In *McDermott,* our analysis of the *Shurupoff* and *Hoffman* cases was as follows:

At the conclusion of the *Shurupoff* opinion, we announced an interpretation of Hoffman's main holding by stating that we, in Hoffman, "should have stopped there. Instead, we continued, in the very next sentence: ..." and we proceeded to describe the qualifying language from Hoffman. Our *Shurupoff* opinion stated:
"Having first announced that the best interest of the child 'is always determinative in child custody disputes,' we did muddy the waters a bit by stating that, unless the trial court finds unfitness or exceptional circumstances that would make custody in the parent detrimental to the child's best interest, it need not 'inquire into the best interest of the child in order to make a proper custodial disposition.'" *Shurupoff,* 372 Md. at 661–62, 814 A.2d at 557. We then continued by stating, without overruling the language from Hoffman, that "the court must always, necessarily, inquire into what is in the child's best interest, for that is the ultimate, determinative factor." *Shurupoff,* 372 Md. at 662, 814 A.2d at 557. With that additional language, if it stands, Maryland has gone from, questionably, the majority view in this country as to private third-party custody actions to clearly the minority view. That was not the intention of the Court.

**16.** Additionally, a progression of the law on this topic that involves adjustments and corrections is explainable in part by the tremendous difficulty in formulating clear rules and standards to instruct judges how to handle cases requiring insight and intuitive judgment about individuals and their frailties, as well as the wisdom to deal with the clashing of parental constitutional rights against a child's future.

that the child's best interests and exceptional circumstances are inseparable:

> Nonetheless, our case law has been clear and consistent, that, even in contested adoption and TPR cases (and in permanency plan proceedings that may inevitably lead to a TPR case), where the fundamental right of parents to raise their children stands in the starkest contrast to the State's effort to protect those children from unacceptable neglect or abuse, the best interest of the child remains the ultimate governing standard.

*Rashawn*, 402 Md. at 496, 937 A.2d at 189. The opinion also recognized that "the child's welfare is a consideration that is of transcendent importance when the child might otherwise be in jeopardy." *Id.* (internal quotations and citations omitted).[17]

Judge Wilner then harmonized the earlier cases, as he explained how to achieve the appropriate balance when the interests of parents and the interests of children conflict in a TPR case:

> The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how. If the court does that—articulates its conclusion as to the best interest of the child in that manner—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

---

17. Thus, the court impliedly disapproved the inconsistent language in *McDermott* saying that "the constitutional right [of the parent] is the ultimate determinative factor." 385 Md. at 418, 869 A.2d at 808.

*Id.* at 501, 937 A.2d 177 (emphasis in original). This harmonizing synthesis of the law should be the touchstone for courts in TPR cases.[18]

■ A careful examination of *Rashawn* reveals that, despite inclusion of the "no further inquiry" language, the Court intended only to place the parent's important rights in proper perspective, not to elevate it above the child's best interest, which is the standard infusing all elements of the typical child custody analysis.[19] As we explained in *Rashawn,* while the parental rights are recognized and the statutory requirements of FL Section 5–525 must be met, the child's best interest standard trumps all other considerations.[20] The present case

---

**18.** The Court in *Rashawn* also elaborated on what it meant by the child's "best interest":

We agree with Ms. F. that poverty, of itself, can never justify the termination of parental rights. The fundamental right of parents to raise their children is in no way dependent on their affluence and therefore is not diminished by their lack thereof. Nor will homelessness, alone, or physical, mental, or emotional disability, alone, justify such termination. That is not what the statute permits, however. What the statute appropriately looks to is whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare. As former FL § 5–313(c)(1) and current § 5–323(d) make clear, primary consideration must be given to "the safety and health of the child."
402 Md. at 499–500, 937 A.2d at 190–91.

**19.** *Rashawn* also shed light on how we may interpret the "no further inquiry" phrase That phrase should not be read to mean that a court may focus exclusively or even primarily, on the parent, or her interests or perspectives, in determining "exceptional circumstances" and then, finding none, fail to treat the child's best interest as transcendent. Rather, it just means that in deciding the "best interest" of the child, the court should always keep in mind the presumption that a child is better off with his parent. So, in examining all of the parent's and the child's circumstances, if the court fails to find "exceptional circumstances," then the presumption will resolve the issue. The "no further inquiry" phrase simply means that after a court does this analysis, and finds no exceptional circumstances showing that it is in the child's best interest to be in the custody of someone other than the parent, it should not then undo that decision by re-examining the child's best interest without also keeping in mind the constitutionally based parental presumption.

**20.** Likewise, in *In re Karl H. and Anthony H.,* 394 Md. 402, 906 A.2d 898 (2006), while holding that a concurrent permanency plan calling

simply presents an example of how the "no further inquiry" language can be misleading to trial courts and others unless understood properly, and why the new harmonizing language penned by Judge Wilner that we set forth above is a better guide for trial courts to follow.

Recently, in *In re Adoption/Guardianship of Alonza D.*, we applied the teachings of *Rashawn*. We were asked to determine whether proof that a child has been in foster care for a lengthy time, without a finding that continuation of the parental relationship would be detrimental to the child, would amount to exceptional circumstances. *In re Adoption/Guardianship of Alonza D.*, 412 Md. 442, 460, 987 A.2d 536, 547 (2010). "Underscor[ing] that the children's welfare continues to be of paramount concern," *id.* at 464, 987 A.2d at 549, we held that "passage of time" alone "is not sufficient to constitute exceptional circumstances," *id.* at 463, 987 A.2d at 548. For exceptional circumstances to exist, the court must also find that the passage of time when the parent and the child were apart makes continuation of parental relationship detrimental to the best interest of the child. *See id.*

Examination of these cases, spanning 33 years of Maryland jurisprudence on the topic, reveals that despite occasional rhetoric suggesting otherwise, the child's best interest has always been the transcendent standard in adoption, third-party custody cases, and TPR proceedings.[21] Mindful of this precept, we now turn to the trial court's rulings on the specific facts of this case.

---

for adoption and reunification is immediately appealable, we stated:
> [T]he best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute. A State's role in a child's care and protection should take on utmost importance, while a parent's right may not be absolute. A parent's rights may be diminished, when there is a conflict between the rights of the parents or legal guardian and those of the child, the child's best interest shall take precedence.

*Id.* at 402, 416, 906 A.2d at 906 (internal citations and quotation marks omitted).

**21.** We do not address today the appropriate standard in third-party visitation cases.

## Applying The Best Interest Standard

▮ Ta'Niya argues that the juvenile court erred in denying DSS's petition for termination of Ms. L.'s parental rights because the court failed "to apply previous case law and the statutory factors to determine whether exceptional circumstances existed." Ta'Niya attributes this failure on the juvenile court's part to the court's misinterpretation of this Court's holding in *Rashawn*, as shifting the best interest consideration from the child to the parents. Ta'Niya contends that such an interpretation was erroneous because, in deciding *Rashawn*, this Court noted that "[it] did not regard this Opinion as changing any substantive law." (Quoting *Rashawn*, 402 Md. at 505 n. 12, 937 A.2d at 194 n. 12). Ms. L. counters by arguing that the juvenile court correctly understood *Rashawn.* According to Ms. L., the court properly did not find exceptional circumstances because, as the court stated, "although it wasn't a great performance by the mother, she did much of what she was asked for. Not timely, not well-documented, but what she didn't do I don't think rises to the level of extraordinary circumstances that would justify termination."

In order to assess Ta'Niya's contention that the juvenile court misinterpreted our holding in *Rashawn*, prompting it to erroneously focus on the parent's circumstances rather than the child's best interest, we must examine the record. First, we see the juvenile court's ruling and the discussion with counsel that preceded it, during which the juvenile court repeated three times that "*Rashawn* changed the landscape." Next, during DSS's closing argument, the court observed that in *Rashawn*, "[t]he Court of Appeals made new law.... They took something and they made a new requirement and it overcomes all the past." Then, during DSS's closing argument, the juvenile court explained, "[t]he Court of Appeals has changed it now from how it looks to the child to what should happen regarding the parents.... It's gone from best interest of the child to best interest of the parents." (Emphasis added). Still later, when DSS attempted to point out that *Rashawn* did not change the fact that the child's best interest was "still the governing standard," the court disagreed, "[o]h

yes it did, I think it did. It changed it from the focus on the best interest, although they refer to that, it really is about a new requirement."

Although the Court of Special Appeals concluded that "notwithstanding [the juvenile court's judge's] colorful description of the holding in *Rashawn*, he remained focused on the appropriate legal standard and considered the relevant statutory factors," we do not think the record supports such a conclusion. By its own admission, the juvenile court "[went] through [FL Section 5–323] D [sic] considerations very quickly," almost as an afterthought, following its finding that there were no exceptional circumstances, and apparently giving little, if any, weight to the FL Section 5–323(d)(4) factors that address termination of parental rights from the point of view of the child's circumstances.

In its finding that there were no exceptional circumstances that would make continuation of parental relationship detrimental to Ta'Niya, the court focused on Ms. L.'s circumstances, not Ta'Niya's best interest. For instance, at the very beginning of its bench opinion, the court observed that "overall, although it wasn't a great performance by the mother, she did much of what she was asked for. Not timely, not well-documented, but what she didn't do I don't think rises to the level of extraordinary circumstances that would justify termination." Later, the court reiterated, "[t]his mother is not ready, I don't know if she'll ever be ready, but [either] she has not proved herself and [DSS] hasn't proved her to be [ ] unfit or [the] failure for lack of timely performance do[es] not amount to exceptional circumstances that justify termination of parental rights."

In contrast, the court did not address Ta'Niya's emotional ties or lack thereof toward Ms. L. or her half-sibling, Jamiara, under FL Section 5–323(d)(4)(i), or Ta'Niya's feelings about the severance of her relationship with Ms. L. under FL Section 5–323(d)(4)(iii).[22] With respect to the likely impact the

---

22. The court declined to interview Ta'Niya in camera, explaining that interviews of young children tend to produce unreliable testimony and

termination of Ms. L.'s parental rights would have on Ta'Niya under FL § 5–323(d)(4)(iv), the court found that "it would be very upsetting going from where she is now to some place else. I mean, she is in a good circumstance[,]" but noted that "*Rashawn* would almost ask us to ignore that." The court did, however, under FL Section 5–323(d)(4)(ii), find that Ta'Niya was "[v]ery good with the foster parents," "very good in the community, the home, the placement, and the school since she's been with [the foster parents]."

Further evidence that Ms. L.'s interests, as opposed to Ta'Niya's best interest, played the primary role in the juvenile court's determination that no exceptional circumstances existed is the court's apparent belief that a finding of exceptional circumstances is not unique to a particular child. The court was so troubled by the fact that DSS sought to terminate Ms. L.'s parental rights with respect to Ta'Niya after it had returned Jamiara to her, that it could not see how there could be exceptional circumstances with respect to Ta'Niya. The court expressed this belief, saying "there's only one mother and you want to label her as unfit, you want to say that all of the factors that are in [FL Section] 5–323, if they are looked upon as supporting exceptional circumstances, then it's the same with respect to Ja'Mira [sic] as it is with respect to Ta'Niya[.]" The court elaborated further, "[i]f the mother is unfit or if exceptional circumstances exist which would justify terminating the parental relationship between her and Ta'Niya, I just cannot see that being consistent, or the placement of Ja'Mira being consistent with granting the Petition to Terminate Parental Rights with respect to a sibling."

cause children unnecessary trauma. We do not profess an opinion as to whether this was an abuse of discretion, except to say that the judge did exercise his discretion. Despite his admittedly strong opposition to interviewing children because of the potentially adverse effects, the judge did not embrace an absolute prohibition against such interviews: "[Interviewing] may work in some situations and when I find that situation I will do it. But I'm so concerned about hurting a child just to have ... something that might influence my decision.... So I will decline the request."

■ Such a characterization of the exceptional circumstances analysis is incorrect as it does not take into account circumstances particular to an individual child. A court may reach different conclusions under FL Section 5–323(d) regarding different children of the same parent. Indeed, as the facts of this case demonstrate, a parent may, for example, have regular and frequent contact with one child, but not the other, and have varying degrees of success in completion of different service agreements with respect to each child. Also, depending on the age at which the children of one parent were placed in foster care, the length of time they spent in foster care, and the frequency of contact with the natural parent, one child may have maintained or formed an attachment to the natural parent, while the other child has not.

The Circuit Court's approach fails to treat the child's best interest as the transcendent standard, perhaps because of the "no further inquiry" language from *Ross* and *McDermott*. The observations and findings by the juvenile court convince us that the court did not just give *Rashawn* a "colorful description," as the Court of Special Appeals found, but that it applied the wrong standard.[23]

■ As we instructed in *Rashawn*, the factors under FL Section 5–323(d) serve both as the basis for a court's finding (1) whether there are exceptional circumstances that would make a continued parental relationship detrimental to the child's best interest, and (2) whether termination of parental rights is in the child's best interest. *Id.* at 499, 937 A.2d at 190. Since one cannot make a determination of whether there are exceptional circumstances that would overcome the presumption of parental rights and make continuation of parental rights detrimental to the child's best interest without looking into the child's best interest, the ultimate focus of the juvenile court's inquiry must be on the child's best interest.

---

**23.** The trial court, of course, did not have the benefit of this opinion in its interpretation of the cases which caused it to conclude that the child's best interest could be trumped by parental rights that were in direct and irreconcilable conflict with the child's best interest.

## Conclusion

Because the juvenile court applied an incorrect standard in deciding whether to terminate Ms. L's parental rights, we vacate its judgment and remand this case for further proceedings in accordance with this opinion. On remand, the parties should be given an opportunity to present additional evidence on the current status of Ms. L. and Ta'Niya.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THE CIRCUIT COURT FOR PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

HARRELL and MURPHY, JJ., concur.

Judge GREENE joins in judgment only.

HARRELL, J., concurring.

I concur in the judgment of the Majority opinion. I write separately principally from trepidation for what the Majority opinion does not state clearly enough for me as to the thrust and sweep of its reasoning when it addresses disapprovingly language in *McDermott v. Dougherty*, 385 Md. 320, 354, 869 A.2d 751, 770 (2005), and *Ross v. Hoffman*, 280 Md. 172, 178–79, 372 A.2d 582, 587 (1977), (and also in *In Re Adoption/Guardianship of Rashawn H. and Tyrese H.*, 402 Md. 477, 495, 937 A.2d 177, 188 (2007)), which holds that "no further inquiry" (or words to that effect) by judges is required into the best interests of the child in custody disputes involving at least one non-parental challenger, unless the presumption of parental control (a right of constitutional dimension) is overcome by sufficient and persuasive evidence of parental unfitness or exceptional circumstances indicating that continued parental control would be detrimental to the best interests of the child. Just as the Majority opinion professes, I too

have great respect for Judge Wilner's opinion for the Court in *Rashawn H.* (which opinion I joined) because it offered a comprehensive and harmonized expression of how to balance the important common law and statutory factors that figure in the proper resolution of a CINA/TPR child custody dispute between parents and the State.[1] Although the Majority opinion in *Ta'Niya C.* also is a well-expressed and well-structured body of legal reasoning for the most part, it contributes little additional insight, in my view, into the relevant area of Maryland family law than did *Rashawn H.*, with the exception of its apparent disapproval of the "no further inquiry" language in *Rashawn H.*, which it traces back to *McDermott* and *Ross.*

In its ambition to restore the status quo before *Ross* and *McDermott* were decided, the Majority opinion muddles the meaning of *Rashawn H.* and the proper role of the legal presumption of parental fitness to raise a child. While recognizing that *Rashawn H.* opined that the best interests of the child "infuses each element of a court's analysis in TPR cases," the Majority opinion here perceives that "other language crept into the opinion and apparently caused confusion." Majority op. at 104, 8 A.3d at 753. The creepy language in *Rashawn H.* that alarms the Majority is *Rashawn H.'s* reiteration of *McDermott's* principle that "if no parental unfitness or exceptional circumstances exist, 'there is no need to inquire further as to where the best interest of the child lies.' " Majority op. at 105, 8 A.3d at 753, citing *Rashawn H.*, 402 Md. at 495, 937 A.2d at 177.[2] The full context of that language from *Rashawn*

1. As Judge Wilner wrote in *Rashawn H.*, 402 Md. 477, 495, 937 A.2d 177, 188 (2007), "[c]ustody and visitation disputes, even between a parent and a third party, are on a different plane than TPR proceedings[,]" for reasons he explained earlier in *Shurupoff v. Vockroth*, 372 Md. 639, 657, 814 A.2d 543, 554 (2003). *Ross* involved a custody dispute, as did *McDermott*. *Rashawn H.* and the present case are CINA/TRP matters.

2. If anything in *McDermott* deserves revisiting, perhaps it is the declaration that " 'the constitutional right [of the parent] is the ultimate determinative factor.' " Maj. op. at 108, 8 A.3d at 756 (quoting *McDermott*, 385 Md. at 418, 869 A.2d at 808). That may go too far, especially when taken out of context.

*H.* is supplied by the Majority in its footnote 13, Majority op. at 105, 8 A.3d at 753–54 (quoting *Rashawn H.*, 402 Md. at 494–95, 937 A.2d at 177–78 (emphasis in *Rashawn H.*)):

The great majority of custody (and visitation) disputes, of course, are between the child's parents, neither of whom, at least since the adoption of our State Equal Rights Amendment (Md. Decl. of Rts., Art. 46), has any preference over the other in that regard. In that setting, the governing standard, here and throughout the country, is and long has been the child's best interest. *See McDermott v. Dougherty,* 385 Md. 320, 353–55, 869 A.2d 751, 770–71 (2005). Custody and visitation decisions in disputes between the parents are made based on what the court finds to be in the child's best interest. That decision generally lies within the sound discretion of the trial judge and is rarely disturbed on appeal.

A different element, though not a different standard, comes into play when the dispute is between a parent and a third party, for in that setting, there *is* a legal preference. In those cases, we have recognized that parents have a fundamental, Constitutionally-based right to raise their children free from undue and unwarranted interference on the part of the State, including its courts. *See,* most recently, *Koshko v. Haining,* 398 Md. 404, 921 A.2d 171 (2007); *also McDermott v. Dougherty, supra,* 385 Md. 320, 869 A.2d 751; *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003); *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977). Even in those cases, however, we have not discarded the best interest of the child standard, but rather have harmonized it with that fundamental right.

We have created that harmony by recognizing a substantive presumption—a presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents. The parental right is not absolute, however. The presumption that protects it may be rebutted upon a showing either that the parent is "unfit" or that "exceptional circumstances" exist which would make continued custody with the parent detrimental to the best interest

of the child. In *McDermott,* the Court made clear that, in a parent-third party custody dispute, the initial focus must be on whether the parent is unfit or such exceptional circumstances exist, for, if one or the other is not shown, the presumption applies and there is no need to inquire further as to where the best interest of the child lies. In *Koshko,* we extended that approach to parent-third party visitation disputes as well.

(Some internal citations omitted.) The Majority opinion surmises that the confusion fostered by the above language is that it "could be interpreted to mean that parental unfitness, exceptional circumstances and the child's best interests are different and separate analyses, and even that the child's best interest inquiry does not come into play until there is a finding of parental unfitness or exceptional circumstances." Majority op. at 105–06, 8 A.3d at 754.

This surmise sets up a "straw man" for the Majority opinion to knock-over by offering a revisionist view of what *Rashawn H.* said and meant. In footnote 19, Majority op. at 111, 8 A.3d at 757–58, the Majority appears to channel for the *Rashawn H.* Court (but without any pinpoint citation to where in *Rashawn H.* the supposed support may be found for the views expressed). The Majority's theory is that

*Rashawn* also shed light on how we may interpret the "no further inquiry" phrase. That phrase should not be read to mean that a court may not focus exclusively or even primarily, on the parent, or her interests or perspectives, in determining "exceptional circumstances" and then, finding none, fail to treat the child's best interests as transcendent. Rather, it just means that in deciding the "best interest" of the child, the court should always keep in mind the presumption that a child is better off with his parent. So, in examining all of the parent's and the child's circumstances, if the court fails to find "exceptional circumstances," then the presumption will resolve the issue. The "no further inquiry" phrase simply means that after a court does this analysis, and finds no exceptional circumstances showing that it is in the child's best interest to be in the custody of

someone other than the parent, it should not then undo that decision by re-examining the child's best interest without also keeping in mind the constitutionally based parental presumption.

I do not agree with this reading of *Rashawn H.* That is not what the Court meant then (and most certainly is not what I meant when I "signed on" to that opinion, and earlier *McDermott*).

I submit that the Majority opinion misunderstands the role that *Ross, McDermott,* and *Rashawn H.* contemplate for the parental presumption. The parental presumption serves, among other things, as a procedural and evidentiary ordering device to establish how child custody, guardianship, and visitation disputes should unfold in our courthouses. It orders who has shifting burdens of production and proof by establishing a pre-existing rebuttable presumption (infused with the notion that it is in the best interest of the child to be raised by the parent) that must be overcome (rebutted) in the court's mind by a challenger with sufficient and persuasive evidence of parental unfitness or exceptional circumstances. Because the presumption exists, even before suit is initiated, a failure of proof to overcome the presumption leads, as *Ross, McDermott,* and *Rashawn H.* explain, to no need to inquire further. If the apparent disagreement between my view and that of the Majority is seen as merely a semantical brouhaha, it is one created by the Majority opinion's unnecessary revisiting and interpretation of *Rashawn H.*

While I believe I understand what the Majority opinion aspires to do, I remain concerned where its reasoning leads beyond what the opinion appears willing to admit. What of *Koshko? Koshko,* a visitation dispute between custodial parents on one side and maternal grandparents on the other, under the Maryland grandparental visitation statute (Md. Code, Family Law Article § 9–102), employs a similar standard/element to that found in *Ross, McDermott,* and apparently *Rashawn H.,* which the Majority opinion proposes, at the very least, to write-out of our child custody jurisprudence. The Court in *Koshko* held "that there must be a finding of

either parental unfitness or exceptional circumstances demonstrating the current or future detriment to the child, absent visitation from his or her grandparents, as a prerequisite to application of the best interest analysis." 398 Md. at 444–45, 921 A.2d at 195. In accomplishing this, we overruled inconsistent language in five prior Maryland appellate opinions. *Id.*[3] The need to rely on a "prerequisite" determination was necessary in order to give a judicial gloss to the statute, under the doctrine of constitutional avoidance, so that the statute could be sustained in the face of a substantive due process challenge. It was argued that the statute failed "to recognize a rebuttable presumption accorded the propriety of a parent's determination of what is in his or her child's best interest with respect to visitation with a grandparent." 398 Md. at 407, 921 A.2d at 173. Unwilling as I am to unravel *Koshko*[4] and brand the grandparental visitation statute with the sobriquet of unconstitutionality, I turn next to the task of distinguishing *Koshko* from the present case.

*Koshko* is distinguishable on the basis that it involved child visitation, while *Ta'Niya C.* involves custody.[5],[6] Although *Koshko* treated custody and visitation as equivalent for purposes of determining the level of judicial scrutiny to be given

---

**3.** I note in passing that the Majority opinion in *Ta'Niya C.* presumably concedes (because it neither mentions nor attempts to deconstruct the analysis in *McDermott*) that its restoration of the pre-*Ross*, pre-*McDermott* state of our child custody jurisprudence removes Maryland from the considerable majority of our sister states on this score. *See McDermott*, 385 Md. at 375, 869 A.2d at 783 (2005).

**4.** Likewise, at least three subsequent reported opinions of the Court of Special Appeals, applying *Koshko* (without demurrer), are implicated. *See Aumiller v. Aumiller*, 183 Md.App. 71, 959 A.2d 849 (2008); *Barrett v. Ayres*, 186 Md.App. 1, 972 A.2d 905 (2009); and, *Brandenburg v. LaBarre*, 193 Md.App. 178, 996 A.2d 939 (2010).

**5.** See footnote 1 *supra*.

**6.** Judge Eldridge, the lone dissenter in *Koshko*, nonetheless was of the view that *Koshko* was "quite distinguishable" from *McDermott* on this ground, among others. *See Koshko*, 398 Md. at 446, 921 A.2d at 196.

the statute, in the face of a substantive due process challenge, it was observed there that

> [t]here is no dispute that the grant or modification of visitation involves a lesser *degree* of intrusion on the fundamental right to parent than the assignment of custody. We except from this notion, however, that, because of this conceptualization, visitation somehow ranks lower on the "scale of values" such that its determination does not require the application of stringent tests as is the case with custody. In other words, although there may be a difference in the degree of intrusion, it is not a difference of constitutional magnitude. Visitation, like custody, intrudes upon the fundamental right of parents to direct the "care, custody, and control" of their children.

*Id.* at 430, 921 A.2d at 186 (footnote and internal citation omitted; emphasis in original). Thus, *Koshko's* reasoning followed its tact because *Koshko* engaged necessarily in constitutional analysis of a statute. *Ta'Niya C.* does not. Thus, the differences between custody and visitation in a non-constitutional analysis (like *Ta'Niya C.*) is a significant basis upon which to distinguish *Koshko* from *Ta'Niya C.* Then again, perhaps I do not need to engage in mental gymnastics to distinguish *Koshko,* nor the Majority to erase portions of *Ross, McDermott,* or *Rashawn H.* The trial court's express belief in the present case, that *Rashawn H.* "changed the law," was simply wrong. In this mistaken belief, the trial court applied an incorrect standard, but for a reason different than that settled upon by the Majority opinion.

It seems to me that *Ross, McDermott, Koshko, Rashawn H.,* and *Ta'Niya C.* (as do all of our child access cases frankly) strive to describe a proper tension among the factors that may be relevant in resolving virtually all child access disputes. These cases remind our judges to give due weight to the rebuttable presumption that a child's best interests are served by not sundering or interfering with the parental role, unless a judge is persuaded that that presumption is overcome by a quantum of persuasive evidence demonstrating that the parent(s) is/are unfit or that exceptional circumstances exist that

render parental control and affiliation no longer in the best interests of the child(ren). The best interests of the child standard infuses each consideration,[7] and, to that extent, may be described fairly as a transcendent element; but, to lump all of the statutory and/or common law factors into some sort of general melee or mishmash analysis, without due regard for the parental "right," present at the threshold in every child access case (save those between dueling parents), denigrates that "right" and might distract judges into failing to accord it the weight it deserves in the calculus. Directing the flow of the judicial inquiry, by recognizing the existence of the parental right and pointing out that it must be overcome in the first instance, is not new to Maryland law. *Rashawn H.* said this well. I am unpersuaded that *Rashawn H.* merits disapproval or even clarification now.

Judge MURPHY authorizes me to state that he joins the views expressed in this concurring opinion.

---

7. Even the recognition of the parental right is grounded on the belief that the best interests of a child are served by being reared by his/her parents (or parent).