*In re: Adoption/Guardianship of C.E.*, No. 77, September Term 2017.  Opinion by Hotten, J.

**FAMILY LAW — TERMINATION OF PARENTAL RIGHTS — BEST INTEREST OF THE CHILD**

The best interest of the child standard is the overarching consideration in termination of parental rights proceedings pursuant to Maryland Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article.  However, a finding of exceptional circumstances or parental unfitness must still be weighed against a determination of whether the termination of parental rights is in the best interest of the child.

**FAMILY LAW — TERMINATION OF PARENTAL RIGHTS — CONSIDERATION OF STATUTORY FACTORS — ABUSE OF DISCRETION**

When terminating parental rights pursuant to Maryland Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article, a juvenile court must assess the statutory factors outlined in § 5-323(d).  In this termination of parental rights proceeding, the assessment of statutory factors by the juvenile court regarding the child's father was reasonable, where the father had a close relationship with the child that would be detrimental to the best interest of the child if ended. With regard to the child's Mother, the juvenile court abused its discretion by failing to specifically assess each aspect of the statutory factors.  Further, assessment of the statutory factors could not reasonably demonstrate that the child's best interest was served by maintaining a relationship with the mother, where the mother failed to utilize reunification services, the mother's rights to four of her other children have been terminated, and the child exhibited no connection to the mother.

**FAMILY LAW — TERMINATION OF PARENTAL RIGHTS — PERMANENCY**

A sense of permanency, not necessarily adoption, fulfills the purpose of termination of parental rights proceedings carried out under Maryland Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article.  The juvenile court's decision to maintain a parental relationship between the child and his father, while providing indefinite custody to a third party, sufficiently effectuated the statutory goal of permanency.

Circuit Court for Baltimore City
Case No. T16106011
Argued: June 1, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 77

September Term, 2017

_____

IN RE: ADOPTION/GUARDIANSHIP
OF C.E.

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Hotten, J.
Watts, J., dissents.

_____

Filed: August 13, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

We consider here whether allowing a child to remain indefinitely in the custody of a third party, without terminating the parental rights of both parents, constitutes a proper exercise of judicial discretion consistent with the relevant provisions of the Family Law Article.  As will be explained, the law allows for such discretionary exercise so long as the decision is grounded in the statutory requirements, and supported by the record.  In that regard, pursuit of the best interest of the child remains the overarching goal in proceedings involving the termination of parental rights ("TPR") pursuant to Md. Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article ("Fam. Law").  In the present case, a rational finding exists that a continued relationship with C.E.'s father, H.E. ("Father") serves C.E.'s best interest, even where complete custodial reunification is not apparent. It was not therefore an abuse of discretion for the juvenile court to decline to terminate Father's parental rights.  However, in the matter of C.E.'s mother, C.D. ("Mother"), the juvenile court's determination that a continued parental relationship served C.E.'s best interest lacked consideration of the relevant statutory considerations found in Fam. Law § 5-323. Accordingly, we affirm in part, and reverse in part, the judgment of the juvenile court.

## BACKGROUND

C.E. ("C.E." or "the child") is a male child, born in May 2014, to Mother and Father. All of Mother's six other children have entered the foster care system through removal by the Baltimore City Department of Social Services ("Department").

The lengthy, litigious history of C.E. began shortly after he was born prematurely with complications arising from low birth weight.  Before C.E. left the hospital, the Department filed for emergency shelter care in the Circuit Court for Baltimore City.  At a

hearing on July 11, 2014, the juvenile court granted the Department's request for temporary care and custody of C.E., and placed him with distant relatives while the Department began a Child in Need of Assistance ("CINA")[1] proceedings. On June 16, 2015, the juvenile court found C.E. to be a CINA and awarded custody to the Department for continued relative placement. On Mother's appeal to the Court of Special Appeals, the Court affirmed the judgment of the juvenile court. *See In re C.E.*, No. 0925, Sept. Term, 2015 (Md. Ct. of Sp. App., December 15, 2015), *cert. denied*, 446 Md. 705, 133 A.3d 1110 (2016).

On April 20, 2016, the juvenile court held a hearing regarding the Department's motion to waive its obligation to continue to make reasonable efforts to reunify Mother with C.E. The juvenile court granted the Department's motion to waive reunification efforts, concluding that it lacked discretion to deny the motion under § 3-812(d)[2] of the Courts and Judicial Proceedings Article ("Cts. & Jud. Proc.") of the Maryland Code, in light of the prior involuntary terminations of Mother's parental rights over four of C.E.'s

---

[1] Maryland Code (1973, 2013 Repl. Vol., 2016 Supp.), § 3-801(f) of the Courts and Judicial Proceedings Article ("Cts. & Jud. Proc.") defines a "Child in need of assistance" or "CINA" as:

   a child who requires court intervention because:
   (1) [t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
   (2) [t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

[2] Cts. & Jud. Proc. § 3-812(b) and (d) together allow a juvenile court to waive reunification efforts between a parent and child where the parent "[h]as involuntarily lost parental rights of a sibling of the child." Cts. & Jud. Proc. § 3-812(b)(3).

siblings. Mother appealed. The Court of Special Appeals determined that the juvenile court's decision to waive reasonable efforts for reunification was not appealable and therefore dismissed the appeal. *In re C.E.*, No. 0464 Sept. Term 2016, 2016 WL 7235560 (Md. Ct. Spec. App., Dec. 14, 2016), *aff'd*, 456 Md. 209, 172 A.3d 476 (2017).

Following this Court's determination on waiver, the Department filed a Petition for Guardianship with the Right to Consent to Adoption or Long Term Care Short of Adoption. On September 1, 2017, the juvenile court denied the Department's petition. After noting timely appeals to the Court of Special Appeals, C.E. and the Department (collectively, "Petitioners") filed petitions for writ of *certiorari*, which this Court granted on February 5, 2018. Mother and Father (collectively, "Respondents" or "the parents") responded. Together, Petitioners collectively pose the following five questions before this Court:

1. Whether a CINA child has a protected interest in achieving a timely permanency plan of adoption that transcends his parents' right to raise him, where the three (3) year old child has resided in the same relatives' home since birth and where the trial court found, by clear and convincing evidence, that reunification is "unachievable….in the foreseeable future"?
2. Whether it is error of law for a court to change a CINA child's permanency plan in a [g]uardianship proceeding conducted pursuant to [Family Law] 5-323?
3. Whether the court's application of its findings of exceptional circumstances to justify custody and guardianship to relatives instead of using the exceptional circumstances to support a grant of guardianship, was an error of law in contravention of the statute's clear preference for adoption over custody and guardianship?
4. Did the juvenile court err when it failed to find that Father was unfit to remain C.E.'s legal father in light of its finding, by clear and convincing evidence, that there was no likelihood that Father would ever be able to safely care for C.E.?
5. Did the juvenile court err as a matter of law in its exceptional circumstances analysis, by elevating an incidental "parental" relationship

3

over C.E.'s best interests in achieving the permanence afforded by adoption?

For reasons that follow, we hold that that the juvenile court acted within its discretion to deny the Department's petition to terminate Father's parental rights, where it is not detrimental to the best interest of the child for the parental relationship to remain intact. However, the juvenile court abused its discretion to grant the Department's TPR petition as to Mother, where a review of the relevant statutory factors in § 5-323(d) resulted in a finding of unfitness and exceptional circumstances by clear and convincing evidence.

## C.E.

When C.E. was born prematurely in May 2014, he was placed in the Neonatal Intensive Care Unit of Johns Hopkins Hospital, and later transferred to Mount Washington Pediatric Hospital for further care. One of the Department's caseworkers, Nia Noakes, responded to a "risk of harm" report by Johns Hopkins Hospital and request for a safety assessment of a newborn. Upon receipt of the initial report, Ms. Noakes completed a safety assessment of Mother's home with both parents present. Ms. Noakes also consulted the Department's records to determine whether the family had a history with Child Protective Services, at which point she discovered that the Department removed Mother's other children from her care. Thereafter, Ms. Noakes held a Family Involvement Meeting ("FIM")[3] to determine whether C.E. could safely be placed with either Mother or Father.

---

[3] A FIM is a casework practice with the purpose of establishing "a team to engage families and their support network to assess the needs and develop service plans. The goal is to develop service plan recommendations for the safest and least restrictive placement for a child while also considering appropriate permanency and well-being options for that child." Department of Human Resources, Policy Directive SSA # 10-08, August 14, 2009,

4

In light of Mother's extensive child protective services interactions and mental health history, the Department determined that C.E. would not be safe with Mother. Father was also not suitable to care for C.E. because he resided in a senior housing complex, which only allowed children to visit for a maximum of two weeks.

On July 11, 2014, the juvenile court authorized C.E.'s shelter-care placement after his hospital discharge, because Mother "has a history of posing a threat to children" and a long history of psychological conditions that "could prove a safety risk[.]" After the juvenile court granted shelter care, the Department transferred the case to Diana Wade Williams as the permanency caseworker. Two weeks later, the juvenile master approved the CINA petition and ordered C.E.'s placement in the Department's custody.

In late June or early July 2014, Mother telephoned her cousin, Ms. B., advised her that she could not take C.E. home from the hospital, and asked for permission to provide her contact information to Mount Washington Pediatric Hospital and the Department. Mother and Ms. B. had not been in contact for years prior to C.E.'s birth, and only reconnected when Mother found Ms. B. on Facebook. About one hour after Mother's call, Ms. Wade Williams contacted Ms. B. and requested permission to conduct a background check. By July 15, 2014, Ms. B. and her husband, Mr. B., passed the necessary clearances. Upon C.E.'s July 21, 2014 hospital discharge, the Department placed C.E. with Mr. and Ms. B., where he has remained.

---

https://dhr.maryland.gov/documents/SSA%20Policy%20Directives/Child%20Welfare/SSA%2010-08%20Family%20Involvement%20Meetings%20FIMs.pdf (https://perma.cc/TGH5-DAEK) (last visited July 26, 2018).

After C.E.'s release from the hospital, C.E. received health intervention services until January 2015. C.E. continues to have seizures, and receives medication for epilepsy by a neurologist. C.E. also exhibits delays in physical growth and has problems with communication, executive functions, and attention deficit. He is undergoing a formal diagnostic process at Johns Hopkins Bayview Medical Center to determine whether he is on the autism spectrum. Reports prepared by Laurie Higginbotham, LCSW-C, a clinical social work supervisor for the Department, otherwise indicate that C.E. takes direction from Mr. and Ms. B. and is happy in their home. Mr. and Ms. B. want to adopt C.E. and are willing to allow Mother and Father to have occasional on-going contact with C.E. at a neutral location.

**Mother**

Since 1996, the Department has interacted with Mother arising from abuse and neglect allegations involving her six children. Because of her inability to care for her children, Mother lost parental rights to four of her six children: I.S., L.B., J.D., and M.D. Mother's second child, I.S., was found to be a CINA in 1998. Her third child, L.B., was also found to be a CINA in 1999. In 2003, following a contested hearing, a juvenile court terminated Mother's parental rights over both I.S. and L.B. The Court of Special Appeals affirmed the juvenile court's termination of Mother's parental rights. *See In re Adoption of India S.*, No. 2032, Sept. Term 2003 (Md. Ct. Spec. App. Nov. 29, 2004). Mother's fourth and fifth children, J.D. and M.D., were both found to be CINA in 2012. After a contested hearing in 2014, Mother's parental rights with respect to J.D. and M.D. were also terminated. Again, the Court of Special Appeals affirmed. *In re Adoption of Joy D.*, No.

6

2307, Sept. Term 2014, 2015 WL 5821580 (Md. Ct. Spec. App. Aug. 13, 2015). Mother's other son, J.S.B., was in foster care for fourteen years, aging out on his twenty-first birthday in 2012. When Mother had her sixth child, C.E., in 2014, the Department intervened once again. *In re C.E.,* No. 0925, Sept. Term 2015 (Md. Ct. Spec. App. Dec. 15, 2015), *cert. denied*, 446 Md. 705 (2016).

Mother has a well-documented history of mental illness, causing her to lash out against her children. Her "previous mental health diagnoses include paranoia, adjustment disorder, major depression, somatization disorder, borderline personality disorder, mania, and bipolar affective disorder." *In re C.E.*, 456 Md. at 211, 172 A.3d at 477. Mother believed her daughter J.D. required treatment by a "licensed professional exorcist, a psychic spiritual adviser, a polygraph expert and a voodoo witch doctor." Mother referred to J.D. as "evil devil[,]" "demon of hell," and requested she be hospitalized to excise demons. *In re Joy D.*, 216 Md. App. 58, 65, 84 A.3d 223, 227 (2014), *abrogated by In re C.E.*, 456 Md. at 209, 172 A.3d at 476. Mother threatened to kill one of the Department's social workers, which led to J.D. becoming increasingly afraid and crying uncontrollably. Similarly, Mother exhibited anxious and angry behavior toward M.D. Mother was observed beating M.D.'s back when he was twenty-one months old. *Id.* at 64, 84 A.3d at 226. Throughout the proceedings involving Mother's other five children, the Department provided numerous services to assist with her mental health issues, but none were successful.

Following C.E.'s birth, the Department attempted to enter into service agreements with Mother, and made numerous referrals for mental health services. During the summer

7

of 2014, Mother received treatment from Stanley Karanja, LCPC, at Therapeutic Living for Families. Mother filed a complaint against him, claiming that he engaged in unethical practices, rendered false diagnoses, and falsified her mental health records. Mother lodged similar complaints against three of her previous therapists at three different treatment facilities. In March 2015, Mother participated in three counseling sessions with Turn Around, Inc., an agency that provides services to victims of domestic violence and sexual assault. On March 30, 2015, Turn Around Inc. recommended that Mother receive more intensive services from an in-home program such as Mosaic Community Services Psychiatric Rehabilitation Program. Mother attended a May 21, 2015 appointment with Mosaic Community Services Psychiatric Rehabilitation Program and attended a diagnostic evaluation on June 12, 2015. However, Mother requested a referral to Hebron House Inc., a therapy program, where she participated in another assessment on June 26, 2015. Mother claimed she was no longer comfortable with the assigned therapist, and requested that Hebron House Inc. assign another therapist and provide therapy during Mother's visitation with C.E. at the Department. In 2015, during Mother's home-therapy session, the therapist "felt threatened by [Mother's] combative stance and she had to leave because the atmosphere was no longer conducive for therapeutic rapport building." As a result, Hebron House Inc. was unwilling to continue to provide further therapy to her and recommended outpatient psychiatric services through a hospital.

In fall 2015, Mother received mental health services from two other programs but ceased therapy on her own volition. By March 3, 2016, Mother was receiving therapy through another program, but was discharged after the treatment team "observed a severe

8

pattern of fault finding and no evidence of accepting ownership of behaviors, experiences and outcomes on [Mother's] part." The treatment providers concluded that Mother was unwilling to address her mental health problems and that her prognosis was poor if she did not engage in appropriate services.

In July of 2016, Mother sought and received treatment again but continued seeking out another therapist, hoping to be reunited with her son. After August 2016, Mother did not seek psychiatric treatment until January 1, 2017. Treatment resumed at that time but was terminated on May 18, 2017 when the Johns Hopkins Hospital Community Psychiatry program discharged her because it "had not been able to establish an effective physician/provider relationship...." Mother filed a complaint with Johns Hopkins Hospital Patient Relations Department, but remained discharged. Mother claims that she suffers from legal abuse syndrome, which is not a currently recognized mental illness, as a result of the Department removing five other children from her care. Otherwise, Mother denies that she has any mental illness.

**Father**

Father began his relationship with Mother in 2010, which was marked with instances of angry outbursts by Father. Father is employed full-time as a dishwasher. He has resided in senior citizen housing since C.E.'s birth, which prohibits child residents. Father's first child, who is an adult, entered the foster care system during minority and was raised by Father's sister.

Father entered into a service agreement with the Department that was in effect from July 11, 2014 to September 11, 2014, and committed to finding housing where he could

9

reside with C.E. In July of 2014, the Department referred Father to the Center for Urban Family's parenting classes, which occurred twice a week for three months. Father initially did not attend the classes until January 12, 2015. He completed a weekly ten-week course on positive parenting skills. On June 17, 2017, the juvenile court determined that the Department had made reasonable but unsuccessful efforts to reunify C.E., and ordered that the Department continue to supervise Father's visits with C.E. Father was also ordered to submit to clinical evaluation.

On July 21, 2015, Father underwent the clinical evaluation. Brenda Harriel, a Licensed Clinical Social Worker from the Court Medical Services Office, is an expert in clinical and forensic social work, with an emphasis on the diagnosis and treatment of DSM-5 diagnoses and parenting assessment. Father presented with symptoms of schizotypal personality disorder, a pervasive, enduring pattern of distorted perceptions, which in Ms. Harriel's estimation, is an untreatable personality disorder. Ms. Harriel explained that Father exhibited "symptoms of preoccupation with religion to explain Respondent's [C.E.'s] development.... [C]ognitive, or perceptual distortions. He presented with odd beliefs, peculiar behaviors, inappropriate or constrictive affect, and reduced capacity for close relations." It was Ms. Harriel's expert opinion that Father had "no real interest in… taking care of" C.E. and that, given his personality disorder and refusal to accept services, he "would be unable to provide proper care [for C.E.] in a constructive, protective, and nurturing [way]."

**Mother and Father's Visitation with C.E.**

Since C.E.'s birth, the Department facilitated regular visits between C.E., Mother, and Father. The visits were scheduled weekly during 2014, and bi-weekly from 2015 to 2017. Both parents attended most of the scheduled visits in 2014. In 2014, Mother canceled several visits, and sometimes when she attended she refused to hold C.E. Mother additionally asked to hold several visits as "phone visits."

In 2015, both Mother and Father attended all scheduled visits, but not all visits in 2016. These visits were marked with outbursts by C.E. towards his Mother, but generally positive interactions with Father. The Department's notes indicate that during the January 19, 2016 visit, C.E. would let Father but not Mother hold him. During the February 23, 2016 visit, when Mother tried to kiss C.E., he struck her in the face. When Father went to the bathroom, C.E. cried and fell on the floor until Father returned. In March of 2016, Mother refused to visit.

On December 12, 2016, during Ms. Higginbotham's first visit, there were no toys in the room. Ms. Higginbotham suggested ways Mother and Father could interact with C.E., but Mother was not receptive to these suggestions. Ms. Higginbotham subsequently brought a few toys in from another room, and encouraged Father to use them to engage C.E., but C.E. would not cooperate. Mother became upset and left. Father fed C.E. crackers sent by Mr. and Ms. B., one at a time, but C.E. wanted the whole bag. C.E. threw his juice cup on the floor, and spilled all the crackers trying to grab the bag. Father tried to give him some yogurt with a spoon, but C.E. did not want it. C.E. slapped the spoon and spilled the yogurt on Father's pants. Thereafter, Father ended the visit. After observing

11

Father with C.E., Ms. Higginbotham opined that Father sometimes interacted appropriately with C.E., but caring for him consistently would likely be too stressful for Father. In Ms. Higginbotham's opinion, C.E. required focus and attention that Mother and Father could not provide. In February of 2017, Mother ended her visit early when C.E. again hit her in the face.

### The Juvenile Court's Decision

The juvenile court concluded that it was not in C.E.'s best interest to terminate Mother and Father's parental rights, despite a finding that Mother was unfit by clear and convincing evidence, that Father was unfit by a preponderance of the evidence, and that exceptional circumstances existed that would make a continued relationship with either parent contrary to C.E.'s best interest. Based on these findings, the juvenile court determined that it was in C.E.'s best interest to change his permanency plan to custody and guardianship to Mr. and Ms. B. The juvenile court found by a preponderance of the evidence that reunification with Mother or Father will likely never be achieved. The juvenile court based this determination on both Mother and Father's static personal and financial situations. The court found that although Mother had a desire to be reunified with C.E., "Mother is unable and or unwilling to engage in sustained, consistent effective mental health treatment that will allow her to safely manage the inevitable stress of parenting now or ever." Similarly, the juvenile court concluded that Father also possesses a sincere desire to be reunified and parent C.E., but his apparent unfitness to parent stemmed from both his mental health issues and his unwillingness or inability to find housing for both C.E. and him. Father's unfitness, however, rested in greater part "upon his near total reliance on

12

Mother to parent [C.E.] when he is unavailable during extensive working hours." Although a plan to utilize day care could provide a safe plan for reunification, continued failures to treat Mother's mental health issues indicate that Mother could not receive this necessary support.

The juvenile court reasoned that "[w]hile adoption remains the gold standard of permanency where reunification is not safely possible, in this case the very strong commitment of relatives… to his care, convince this Court that [C.E.] will have the benefit of stability and permanence with the plan adopted here in childhood and into his adulthood." While neither parent was able to care for C.E., the juvenile court was convinced that C.E. has a sufficient connection with his parents, particularly with Father, to generate concern regarding the termination of the parental relationship, and that visitation with Mother and Father has episodically gone well.

The juvenile court utilized the factors enumerated in Fam. Law § 5-323(d)(1), and analyzed the Department's efforts with reunification services, the continued challenges to Mother and Father's mental health, the significant caregiving role that Mr. and Ms. B. play in C.E.'s life, and the special relationship between C.E. and his father. The court reasoned that neither parent had displayed essential safe parenting skills toward C.E., particularly in response to his possible autism spectrum behaviors, seizure disorder, and speech development delays. Additionally, neither parent had contributed financial support towards C.E.'s care and maintenance. Following these considerations, the juvenile court found that exceptional circumstances existed to change C.E.'s permanency plan to guardianship with Mr. and Ms. B., without terminating Mother and Father's parental rights.

13

**STANDARD OF REVIEW**

In reviewing the decision of a juvenile court to terminate parental rights, Maryland appellate courts employ three different, but interrelated, standards of review. *See In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 100, 8 A.3d 745, 750–51 (2010). Factual findings are reviewed under the clearly erroneous standard; legal conclusions are reviewed *de novo*, and the juvenile court's "ultimate decision" is reviewed for an abuse of discretion. *See id.*; *see also In re Adoption/Guardianship of C.A. & D.A.*, 234 Md. App. 30, 45, 168 A.3d 1088, 1097 (2017).

A trial court's findings are clearly erroneous if they are not supported by substantial evidence in the record. *Murphy v. 24th St. Cadillac Corp.*, 353 Md. 480, 497, 727 A.2d 915, 923 (1999). There is an abuse of discretion where "no reasonable person would take the view adopted by the trial court,' or when the court acts 'without reference to any guiding rules or principles.'" *Santo v. Santo*, 448 Md. 620, 625–26, 141 A.3d 74, 77 (2016) (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312, 701 A.2d 110, [118] (1997)). Put another way, this Court will not reverse the juvenile court's ultimate decision "unless its decision is 'well removed from any center mark imagined by the reviewing court.'" *Santo*, 448 Md. at 626, 141 A.3d at 77.

**DISCUSSION**

C.E.'s situation is unique because he has been in the care of the Department since birth. Once four of Mother's children were removed from her custody, and Mother's rights were eventually terminated, the Department immediately petitioned for a finding that C.E.

14

be declared a CINA. Mother and Father never had custody of C.E., but maintained a consistent visitation schedule since C.E.'s placement with Mr. and Ms. B., and both have always desired a relationship with their son. The Department now argues that C.E.'s interest in permanency transcends Mother and Father's parental rights. Father counters that he can act as a lifelong resource for C.E. which, coupled with the long-term custody plan with Mr. and Ms. B., is in C.E.'s best interest. Although permanency is a critical factor in a child's life, the juvenile court reasoned that continuing the parental relationship was in C.E.'s best interest because of the close bond with Father. In essence, the juvenile court determined that it would be a greater detriment to C.E. to have no contact with his parents, than for him to be adopted by Mr. and Ms. B.

### Legal Framework

Recognizing that parents have a fundamental right to raise their children, the United States Supreme Court and this Court have long safeguarded a parent's right "to make decisions concerning the care, custody, and control of their children" under the Fourteenth Amendment of the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060 (2000). In circumstances where it is determined that a parent cannot adequately care for a child, and efforts to reunify the parent and child have failed, the State may intercede and petition for guardianship of the child. Procedurally, the Department must file a TPR petition "to terminate the existing parental relationship and transfer to itself, hopefully for re-transfer to an adoptive family, the parental rights that emanate from that relationship." *In re Adoption/Guardianship of Rashawn H.* ("*Rashawn H.*"), 402 Md. 477, 496, 937 A.2d 177, 188–89 (2007). "[U]nless the parents consent to the adoption of

15

their child, the department is required to petition the circuit court for guardianship pursuant to [Fam. Law] § 5-313.[4]" *In re Adoption of Jayden G.* ("*Jayden G.*"), 433 Md. 50, 56, 70 A.3d 276, 279 (2013) (internal citations and quotations omitted).

Fam. Law § 5-323(b) provides a juvenile court with the authority to terminate parental rights upon a finding of clear and convincing evidence that (1) the parent is unfit to remain in the parental relationship with the child or (2) exceptional circumstances exist that would make continuation of the relationship detrimental to the child's best interest. In determining whether to terminate parental rights, "a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests[.]" Fam. Law § 5-323(d). Although the juvenile court may consider other relevant factors, Fam. Law § 5-323(d) includes four factors that the court must assess in determining whether exceptional circumstances exist, including:

> (1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;
>> (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and
>> (iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;
> (2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:
>> (i) the extent to which the parent has maintained regular contact with:
>>> 1. the child;
>>> 2. the local department to which the child is committed; and

---

[4] *See* Fam. Law § 5-313(a) (stating that "a petition for guardianship shall precede a petition for adoption…").

16

3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii) 1. A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or

B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

2. the mother refused the level of drug treatment recommended by a qualified addictions specialist, as defined in § 5-1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

(iii) the parent subjected the child to:

1. chronic abuse;

2. chronic and life-threatening neglect;

3. sexual abuse; or

4. torture;

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence against:

A. a minor offspring of the parent;

B. the child; or

C. another parent of the child; or

2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

(ii) the child's adjustment to:

1. community;

17

2. home;
3. placement; and
4. school;
(iii) the child's feelings about severance of the parent-child relationship; and
(iv) the likely impact of terminating parental rights on the child's well-being.

Although Maryland's guardianship statute does not define parental unfitness, this Court has held that the "existing statutory scheme is appropriate in evaluating parental fitness for the purposes of terminating parental rights." *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 705, 12 A.3d 130, 132 (2011). These factors "serve also as criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship." *Rashawn H.*, 402 Md. at 499, 937 A.2d at 190.

Critical to a determination of whether the juvenile court erred in declining to terminate Mother and Father's parental rights is analysis of the factors in Fam. Law § 5-323(d). The best interest of the child is the overarching standard in TPR proceedings. It is presumed that maintenance of parental rights serves a child's best interest. The presumption "may be rebutted upon a showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would make continued custody with the parent detrimental to the best interest of the child." *Ta'Niya C.*, 417 Md. at 103, 8 A.3d at 752 (internal citations omitted).

We sought to clarify the best interest of the child standard in *Rashawn H.*, and have repeatedly attempted to distinguish the weighing of the child's best interest that should be the overarching standard against the required statutory considerations and parental rights.

18

*Rashawn H.* identifies three elements of the heightened protection provided to parents in TPR proceedings. First, is the "presumption that the interest of the child is best served by maintaining the parental relationship, a presumption that may be rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Rashawn H.*, 402 Md. at 498, 937 A.2d at 190. Second, this presumption must be overcome by establishing clear and convincing evidence of unfitness or exceptional circumstances to justify TPR, not the preponderance of evidence standard utilized in child custody cases. *Id.* at 499, 937 A.2d at 190. Third, the General Assembly provided factors, referenced *supra*, that the juvenile court must expressly consider in determining whether termination is in the child's best interest. *Id.*

The approach to applying Fam. Law § 5-323, in conjunction with *Rashawn H.*, provides the basis for determining whether the juvenile court abused its discretion. Each TPR proceeding is a factual inquiry, requiring the juvenile court to make specific findings of fact to justify termination of a parent's rights. A juvenile court must specifically examine each statutory factor. The court "cannot simply proceed under the assumption that 'freeing a child for adoption' is inherently better than keeping the child in foster care and maintaining parental rights." *Amber R.*, 417 Md. at 714, 12 A.3d at 138. "[T]ermination is an alternative of last resort, and is not to be taken lightly." *Id.* at 715, 12 A.3d at 138.

## Application of Fam. Law § 5-323

Although we have opined generally regarding the best interest of the child standard, the remedy crafted by the juvenile court in this instance is different from the TPR matters we have previously reviewed. After finding that Mother and Father demonstrated unfitness, the juvenile court expressly found exceptional circumstances supporting a permanency plan of custody and guardianship to Mr. and Ms. B., without the termination of parental rights. The juvenile court reasoned that custody with Mr. and Ms. B. was proper, because C.E. has spent virtually his entire life in their care. C.E. needs attention paid to his various health issues, including his seizures, and possible diagnosis of autism spectrum disorder. Mr. and Ms. B. provide stability, and are willing to provide long-term care.

To paraphrase the statutory factors identified *supra*, Fam. Law § 5-323(d) requires assessment of the following considerations to assess unfitness or exceptional circumstances before termination of parental rights:

(1) The services offered to the parent to achieve reunification;
(2) The parent's effort to change circumstances to achieve reunification in the parent's home;
(3) The presence of factors such as abuse, neglect, drug use, criminal convictions against the child, a sibling, or other parent, or if the parent has involuntarily lost parental rights over the child's sibling;
(4) The child's emotional connection with the parent, siblings, or others who significantly affect the child's best interest.

*See* Fam. Law § 5-323(d).

**Termination of Mother's Parental Rights**

The juvenile court erred by declining to terminate Mother's parental rights upon a finding of unfitness and exceptional circumstances by clear and convincing evidence. In reviewing whether the juvenile court abused its discretion, we are mindful that, "'to be reversed the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *In re Shirley B.*, 419 Md. 1, 19, 18 A.3d 40, 51 (2011) (quoting *In re Yve S.*, 373 Md. 551, 583–84, 819 A.2d [1030, 1049] (2003)). We are cognizant that juvenile courts must apply a statutory TPR directive to factual scenarios that are far from clear. The juvenile court must attempt to balance the child's interest with a parent's fundamental right by considering the factors in Fam. Law § 5-323(d) to determine if there is unfitness or exceptional circumstances that are detrimental to the best interest of the child. A juvenile court must expressly find that "*either* the parent is unfit to remain in a parental relationship with the child, *or* exceptional circumstances exist that would make a continuing parental relationship detrimental to the child, and then fuse such finding with a determination as to the best interests of the child…." *In re Adoption/Guardianship of Jasmine D.*, 217 Md. App. 718, 737, 94 A.3d 837, 849 (2014) (emphasis in original).

The juvenile court struggled to make sense of the amalgamation of the best interest of the child standard, with findings of unfitness and exceptional circumstances. We independently review the legal conclusions of unfitness and exceptional circumstances without deference, and come to a different result.

<u>Services offered to Mother to achieve reunification</u>

Pursuant to Fam. Law § 5-323(d)(1) the Department is generally required to offer reunification services prior to initiating TPR proceedings.  At the outset, the juvenile court recognized that the Department was not required to provide reunification services to Mother, based on the previous contested TPRs involving Mother's other four children pursuant to Cts. & Jud. Proc. § 3-812(b)(3).  *See In re C.E.*, 456 Md. at 209, 172 A.3d at 476.  However, the juvenile court also determined that the Department gave Mother more than adequate efforts at reunification, including referrals to domestic violence counseling and other mental health services, maintaining progress reports, providing a job coach, transportation tokens, and facilitating visitation with C.E., which included some supervised home visits. Yet, despite these services, Mother's mental health remains her greatest impediment to reunification with C.E., and was the primary source of the juvenile court's finding that Mother is unfit by clear and convincing evidence.

<u>Parent's effort to change circumstances to achieve reunification</u>

When considering whether a parent has made an effort to achieve reunification, juvenile courts must consider the extent to which the parent made regular contact with the child, the Department and the caregiver; the parent's financial contribution to the child's upbringing; any disability that would make the parent incapable of addressing the child's needs; and whether any services would bring lasting change within an eighteen month period. Fam. Law § 5-323(d)(2).  In considering these factors, the juvenile court's focused on Mother's visitation, housing, and improvements in Mother's mental health. The juvenile court recognized that visitation with C.E. had initially gone well, but that Mother's

22

visitation with C.E. has terminated early because Mother has become "agitated/stressed/angry and not focused on C.[E.]" However, it appeared to the juvenile court that the contact with Mother has been consistent, even if at times difficult.

Recognizing that Mother had consistently sustained stable housing since 1995, the juvenile court highlighted the continued instability in Mother's mental health. Mother seemingly dissolves into combative and stressful behaviors from "the smallest perceived disrespect[,]" leaving her unable to parent. These behaviors are well documented in previous TPR proceedings of Mother's other four children and the various unsuccessful treatments Mother has undergone including, Therapeutic Living for Families, Hebron House, Inc., Harding Consulting, Turnaround, Inc., Regenerations Counseling Services, Impacting Tomorrow Health Care, Inc., Empowering Minds Resource Center, LP Counseling & Therapist Service LLC, House of Ruth, Therapeutic Living for Families, Johns Hopkins Community Psychiatry Program, and Medstar Health/Good Samaritan Hospital. The juvenile court noted that,

> For purposes of the Court's decision on the factors to be weighed in this contested TPR proceeding, the net result of Mother's inconsistent, disrupted and unstable mental health care, and admittedly erratic medication management, is that Mother is left with the same profound inability to manage stress of virtually any kind without descending to rage, emergent illness, and depression behaviors and is thereby, the Court is convinced, unable and unfit to care for three (3) year old C.[E]. There is no evidence that services or accommodations or a combination of both exist that would now or in the foreseeable future allow Mother to manage her mental health/PTSD disability to safely parent C.[E].

23

In addition to Mother's mental health issues, the court noted that neither parent has contributed support for care and maintenance of C.E. Mother occasionally receives Social Security Income benefits, and is seemingly incapable of sustaining employment.

The presence of abuse, neglect, or a prior TPR proceeding

Although not expressly included in the juvenile court's finding, we note that a key consideration is whether the parent has involuntarily lost rights to the child's sibling. *See* Fam. Law. § 5-323(d)(3)(v). The incontrovertible fact that Mother has lost rights to four of C.E.'s siblings should have been included in the juvenile court's analysis.

Child's emotional ties with the parent and others who may affect the child's best interest

The visitation notes provided by the Department are most illuminating to C.E.'s relationship with Mother. We recognize that C.E.'s tender age lends itself to fleeting emotional outbursts. However, the juvenile court recognized that an improvement in the relationship between Mother and C.E. would require substantial effort by Mr. and Ms. B. to continue facilitating visitation. Ms. Higginbotham's visitation notes indicate that "[d]ue to their history with [Mother], the B[s] do not have contact with her and would not desire to enter into any arrangement for future contact." Further, when Mother had the opportunity for visitation, she "requested separate visits and a pre-planned activity but visits generally don't last for more than a half hour; C.[E.] is stressed, barely tolerates being in the room and attempts to block out the situation[.]"

It appears that the juvenile court failed to weigh the emotional ties that C.E. had with Mr. and Ms. B. in conjunction with his challenging and stressful relationship with Mother. The juvenile court appreciated that Mr. and Ms. B. alone provide safety, security,

24

and financial support for C.E. Ms. Higginbotham's notes similarly demonstrate that C.E. has a profound bond with Mr. B., that would be to C.E.'s detriment if lost. It is clearly in C.E.'s best interest to be in the safety and care of Mr. and Ms. B., given his historically negative relationship with Mother. An appreciation of this factor would have yielded a different result regarding the termination of Mother's parental rights.

In sum, the Department was not required to provide Mother with reunification services. However, even with the many services provided, Mother has achieved no successful efforts at reunification. Fam. Law § 5-323(d)(1), (2). A critical factor, that she has lost parental rights to four of her other children, is present here and cannot be overlooked. *Id.* § 5-323(d)(3). The secure relationship that C.E. has with Mr. and Ms. B. directly contravenes maintenance of visitation with Mother because of Mother's erratic behaviors. *Id.* § 5-323(d)(4). We cannot find any reasonable interpretation of these facts, suggesting that it is in C.E.'s best interest to have a continued relationship with Mother. Accordingly, it was error for the juvenile court to deny termination of Mother's parental rights.

### Termination of Father's Parental Rights

It appears that the juvenile court was cognizant of each of the statutory factors with regard to Father, specifically identifying that C.E. has a strong connection with Father that is missing from the relationship with Mother. The juvenile court determined that the Department endeavored with reasonable efforts to achieve reunification with Father. *Id.* § 5-323(d)(1). The Department prepared service agreements and visitation to advance reunification. *Id.* Despite the services provided, Father still resides in senior housing with

25

no foreseeable plan to relocate. *Id.* § 5-323(d)(2). Father's lack of housing was the primary basis for a finding by a preponderance of the evidence that he was unfit to parent C.E. The Department facilitated visitation with both Mother and Father, which has gone "appropriately and well[.]" *Id.* There do not appear to be any factors like abuse or neglect. *Id.* § 5-323(d)(3). Although Father did not lose parental rights with his older son, that son entered foster care.

C.E.'s emotional connection to Father was a significant factor in the juvenile court's decision not to terminate Father's parental rights. *Id.* § 5-323(d)(4). The court opined:

> This attachment combined with Father's consistent appearance for parenting time, court appearances, employment, patience with Mother, and related efforts leave this court unable to find that a continuation of that relationship between Father and [C.E.] would be contrary to [C.E.'s] welfare. To the contrary, there is an inference on this record that [C.E.] would likely experience loss and grief if Father ceased to be in his life.

The juvenile court identified an intangible aspect of C.E. and Father's relationship that could not be quantified through visits, progress reports, or resource referrals. C.E. shares a special bond with Father that would be detrimental to C.E.'s best interest if terminated. Where these findings are tethered to recognition of the statutory requirements, we decline to disturb the juvenile court's determination.

### The Permanency of Custody with Mr. and Ms. B

Permanency, not specifically adoption, effectuates the purpose of the CINA and TPR statutory framework. Permanency planning is a critical consideration in the scope of CINA and TPR proceedings. In accordance with this premise, Maryland's CINA and TPR statutory framework requires that "[e]very reasonable effort shall be made to effectuate a

26

permanent placement for the child within 24 months after the date of initial placement."
*Jayden G.*, 433 Md. at 84, 70 A.3d at 296 (internal citations and quotations omitted).
"When reunification with a parent is not a viable option, under the CINA and TPR statutory framework, the adoption of the child is viewed—in terms of permanency—as the next best thing." *Id.* A child should have some sense of permanency, and it is in the child's best interest to spend as little time as possible in foster care because foster care often lacks the finality and security that a child may experience if adopted. *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 106, 642 A.2d 201, 205 (1994). Petitioners argue that indefinite custody of C.E. with Mr. and Ms. B., without termination of Mother and Father's rights, fails to achieve that permanency. The goal of permanency does not override the child's best interest standard that applies in TPR proceedings. Where there was not a finding by clear and convincing evidence that Father's continued parental relationship was to C.E.'s detriment, the juvenile court acted within the bounds of the law to craft a remedy that provided security to C.E., permanency for his future, and a continued relationship with Father. Our reading of Fam. Law § 5-323 indicates that it was not an abuse of discretion to order that C.E. continue in the custody of Mr. and Ms. B.

The Department asserts that the juvenile court's permanency plan failed to give primary consideration to C.E.'s health and safety, as required by Fam. Law § 5-323(d), which was an improper exercise of discretion. We disagree, and redirect the Department's attention to *Rashawn H. Rashawn H.* explicitly reiterated that "the best interest of the child remains the ultimate governing standard[]" in contested adoption cases, TPR proceedings, and permanency plan proceedings. *Rashawn*, 402 Md. at 496, 937 A.2d at 189. Although

27

the health and safety language articulated in Fam. Law § 5-323(d) is the goal of the legislation, the parental presumption must still be overcome by finding that "terminating parental rights is in the child's best interests." *Jayden G.*, 433 Md. at 96, 70 A.3d at 303. That can only be accomplished by considering the factors enumerated in Fam. Law § 5-323(d). After expressly considering the four factors in Fam. Law § 5-323(d), the juvenile court determined that removing Father from C.E.'s life would not be in C.E.'s best interest. That determination is not inconsistent with the premise that maintenance of parental rights can be overcome upon a showing that it is in the child's best interest to terminate the parental relationship.

A decision that C.E. would remain with Mr. and Ms. B., without being adopted, is not an exceptional circumstance or a finding of parental unfitness sufficient to justify termination of parental rights. In *In re Adoption/Guardianship of Alonza D.*, 412 Md. 442, 460–61, 987 A.2d 536, 546–47 (2010), this Court applied *Rashawn H.* when holding that where a child has been in foster care for a lengthy time, without a finding that continuation of the parental relationship would be detrimental to the child, is not an exceptional circumstance. *Alonza*, 412 Md. at 461, 987 A.2d at 547. The Court reasoned that the father's failure to complete parenting classes, as well as his inaction in abating the presence of lead in his former residence, did not render an unfit parent, and neither the length of time that Alonza had been in foster care nor the bond to his foster mother, amounted to exceptional circumstances. We reiterated the best interest of the child standard, determining that "[p]assage of time, without explicit findings that the continued

28

relationship with [the father] would prove detrimental to the best interests of the children, is not sufficient to constitute exceptional circumstances." *Id.* at 463, 987 A.2d at 548.

The *Alonza* Court reached its conclusion relying on *McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005), which was not decided in the context of TPR proceedings. In *McDermott*, a seven year old boy's maternal grandparents, the Doughertys, filed a complaint seeking third party custody on the grounds that the child's father, Charles McDermott, was unable to properly care for him because of Mr. McDermott's lengthy absences at sea due to his work as a merchant marine. This Court reasoned,

> [T]he presumption that natural parents are fit to raise their children and/or because natural parents have a fundamental constitutional right to raise their children, or both, there must first be a finding that the natural parents are unfit, or extraordinary circumstances detrimental to the welfare of the child must first be determined to exist, before the 'best interest of the child' test may be applied when private third-parties dispute custody with natural parents.

*Id*. at 375, 869 A.2d at 783. A reading of *Alonza* and *McDermott* dictates that lack of permanency is a factor to be considered in the "best interest of the child" analysis, rather than the sole inquiry.

Permanency is not alone a "protected interest" as Petitioners suggest, but rather another factor that a juvenile court must consider when determining if a termination of parental rights is in the best interest of the child. A juvenile court may undertake a comprehensive approach to achieve a remedy that is in the child's best interest. Father asserts that his inability to regain custody, by itself, does not show that the "continuation of the parental relationship" would be detrimental to C.E.'s best interests. A lack of

29

permanency does not alone equate to parental unfitness or exceptional circumstances that would make it in C.E.'s best interest to terminate the parental relationship with Father. The juvenile court further found that C.E.'s relationship with Father was close and positive. Aside from the fact that Father is not in a position to have custody of C.E., there are no other indications that C.E.'s relationship with Father would be to C.E.'s detriment. Therefore, the juvenile court's decision not to terminate Father's parental rights was not an abuse of discretion.

## CONCLUSION

This specific TPR remedy is based on the factual scenario presented. Although both Mother and Father have consistently wanted a relationship with C.E. and hope to be reunified, it seems unlikely that reunification will ever occur given the substantial mental and sociological limitations involving both parents. The juvenile court chose to focus on the positive aspects of C.E.'s relationship with Mother and Father, when determining that it was in C.E.'s best interest to continue the parental relationship. With regard to Father, we decline to disturb the juvenile court's conclusion following an assessment of the statutory factors in Fam. Law § 5-323(d). However, the intangible value of C.E.'s relationship with Father was absent from his relationship with Mother. Mother's erratic behavior caused by her mental illness, her lack of personal connection to C.E., and her poor relationship with Mr. and Ms. B., indicate that a continued parental relationship with Mother is not in C.E.'s best interest. Given the clear and convincing evidence that Mother

was unfit and exceptional circumstances existed, the juvenile court erred in declining to terminate Mother's parental rights.

**ORDER OF CIRCUIT COURT FOR BALTIMORE CITY, SITTING AS A JUVENILE COURT, AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE PAID BY APPELLANTS.**

Circuit Court for Baltimore City
Case No. T16106011

Argued: June 1, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 77

September Term, 2017
_____

IN RE: ADOPTION/GUARDIANSHIP OF
C.E.
_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.
_____

Dissenting Opinion by Watts, J.
_____

Filed: August 13, 2018

Respectfully, I dissent. I disagree with the Majority that it was not an abuse of discretion for the juvenile court to decline to the terminate parental rights of H.E., C. E.'s father ("Father"), and I would vacate the judgment of the Circuit Court for Baltimore City and remand for a new hearing on this matter. The juvenile court's order in this case is not an order upon which I would affirm the findings of the juvenile court with respect to failing to terminate Father's parental rights.

Md. Code Ann., Fam. Law ("FL") § 5-323 governs a juvenile court's determination of a petition seeking termination of parental rights ("TPR"). Under this section, a juvenile court must consider enumerated factors to determine whether "a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests[.]" FL § 5-323(b). FL § 5-323(d) sets forth the statutory factors to be considered. When balancing these factors, a juvenile court is required to afford "primary consideration to the health and safety of the child[.]" FL § 5-323(d).

In In re Adoption/Guardianship of Rashawn H., 402 Md. 477, 495-96, 937 A.2d 177, 188-89 (2007), this Court considered the appropriate role of the constitutional presumption in favor of the natural parents in the context of a proceeding in which the State seeks to terminate parental rights, and to be appointed as guardian to enable the child to be adopted. In Rashawn H., id. at 498, 937 A.2d at 190, this Court held that, when considering termination of parental rights, there is a "substantive presumption that the interest of the child is best served by maintaining the parental relationship, a presumption that may be

rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." The General Assembly subsequently codified the parental unfitness and exceptional circumstances considerations into the termination of parental rights criteria through amendment of FL § 5-323. 2009 Md. Laws 1761, 1761-62 (Vol. II, Ch. 350, S.B. 58). Despite the codification, questions of interpretation and procedure persisted.

We have uniformly declined, however, to issue a specific formula for determining the best interests of the child, exceptional circumstances, or parental unfitness. Nonetheless, we have not been silent. In <u>Rashawn H.</u>, 402 Md. at 500, 937 A.2d at 191, we stated that the statutory factors appropriately answer the question of "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." In providing this guidance, in <u>Rashawn H. id.</u> at 500, 937 A.2d at 191, we indicated that this is the appropriate question because courts are required to afford priority to the health and safety of the child. This statement of "what i[s] meant by the child's 'best interest'" was again endorsed by this Court in <u>In re Adoption of Ta'Niya C.</u>, 417 Md. 90, 111 n.18, 8 A.3d 745, 757 n. 18 (2010).

In this case, invoking these guiding principles, the Baltimore City Department of Social Services asserts that in declining to terminate Father's parental rights, the juvenile court failed to give appropriate consideration to the safety and health of the child, C.E. At the root of the Department's argument is the assertion that the juvenile court failed to afford appropriate weight to the question of "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare," and,

in doing so, abused its discretion.  Given the nature of the juvenile court's order, I would be inclined to agree.

It is an understatement to say that the juvenile court's order in this case does not support a finding that the juvenile court did not abuse its discretion in declining to terminate Father's parental rights.  At one point the order states: "The findings below show by a preponderance of the evidence that there is no likelihood reunification of C. with Mother and/or Father can be achieved in the foreseeable future, in eighteen months or, indeed, ever."  Nonetheless, without explanation, the order appears to find by clear and convincing evidence that C.D., C.E.'s mother ("Mother") is unfit, but to find merely by a preponderance of the evidence that Father is unfit.  Specifically, the order states: "Both the unfitness found for R's parents (by clear and convincing evidence for Mother; merely a preponderance of the evidence for Father) and the exceptional circumstances found support the change of permanency plan to custody and guardianship without termination of parental rights."  Later, the order concludes: "Regardless, because the burden is not met for TPR as to both parents, the Court is left to DENY the TPR in favor of changing the permanency plan to custody and guardianship without TPR."  The juvenile court's order mixes the standards of proof, and determines a change in permanency plan and a denial of TPR in the same order.

Nonetheless, it is clear that the juvenile court found: (1) that the Department had made reasonable efforts to enable reunification; (2) that neither parent exhibits "essential safe parenting skills;" (3) that Father lacked housing in which C.E. could reside; (4) that, on the whole, neither parent had accomplished a material change to the circumstances

- 3 -

rendering C.E. a CINA; (5) that C.E. has fully adjusted to his placement with Mr. and Ms. B; (6) that neither parent had contributed support for C.E.'s care and maintenance; and (7) that reunification with the natural parents is unachievable within the foreseeable future, if ever. It is difficult to discern from the juvenile court's order whether these facts were found by a preponderance of the evidence or by clear and convincing evidence as to Father. But, the sole factual finding weighing in favor of continuation of Father's parental rights was a determination that C.E. knew and was attached to Father. In sum, almost every other factor delineated under FL § 5-323(d) was found against Father, with the exception of the finding that there is an "attachment" between Father and C.E.

C.E., Mother, and Father are all in apparent agreement that the juvenile court erred in addressing the change in permanency plan in the same order denying the Department's petition to terminate parental rights. Father maintains, however, that any error is harmless, because the error could be rectified by separating the order into two distinct orders. FL § 5-324(a) provides that, in a separate order accompanying an order denying guardianship, the juvenile court shall include any order under Title 3, Subtitle 8 of the Courts and Judicial Proceedings Article that is in the child's best interests, *e.g.*, an order with respect to a change in permanency plan. Here, it is plain that the juvenile court did not comply with this directive because it did not issue a separate order changing C.E.'s permanency plan. As such, the juvenile court's opinion/order raises doubt as to whether the juvenile court reached its conclusions regarding the termination of parental rights and a change in the permanency plan in the proper manner—*i.e.* whether the two related but distinctly different concepts were afforded independent consideration.

- 4 -

Reading the juvenile court's opinion/order, it is difficult to differentiate the FL § 5-323 termination of parental rights analysis from the analysis of the change of permanency plan. A striking example of this lack of clarity is the juvenile court's interwoven analysis of issues upon both a "more likely than not" or preponderance of the evidence standard, and a clear and convincing evidence standard. In another instance, the juvenile court concluded that exceptional circumstances required a change of permanency plan, when parental unfitness or exceptional circumstances are required to terminate parental rights. To be sure, not every instance of procedural non-compliance constitutes reversible error. A juvenile court's failure to issue separate opinions/orders may not, in and of itself, be sufficient grounds for reversal. In this instance, however, it is not possible to conclude that the juvenile court conducted a separate analysis with respect to the termination of parental rights and a change in permanency plan.

Overall, based on the juvenile court's order, it is not possible to affirm the juvenile court's decision declining to terminate Father's parental rights. The finding that Father was not unfit is contradicted by the juvenile court's finding that reunification with neither Father nor Mother was attainable within the foreseeable future, if ever. Although the juvenile court purported to make this finding by a preponderance of the evidence, it is unclear why the juvenile court would be using a preponderance of the evidence standard in assessing the termination of Father's parental rights. It is impossible to conclude that the juvenile court's concurrent consideration of a change in the permanency plan did not affect the ultimate disposition of the termination of parental rights hearing.

For the above reasons, respectfully, I dissent. I would vacate the juvenile court's

order and remand for a new hearing.